A. C. LARSON, Appellee, v. J. T. METCALF et al., Appellants.

**VENDOR AND PURCHASER:** Remedies of Purchaser—Vendee's Right 1 to Lien. A vendee of land is entitled in equity, on proper rescission by him of the contract of purchase, to a lien on the land (1) for the amount of the purchase price advanced by him, (2) for the reasonable value of all proper improvements made on the land by him, and (3) for any other proper expenditure suffered by him and growing out of the contract,—a right enforcible against all parties who take rights in the land with knowledge, actual or constructive, of vendee's rights.

**VENDOR AND PURCHASER:** Remedies of Purchaser—Election of 2 Remedies. A purchaser of land who rescinds, and obtains against the vendor judgment *at law* for the amount advanced as purchase price and for other proper expenditures, does not by that fact alone waive his right to bring an action *in equity* to have the judgment declared a lien on the land.

**VENDOR AND PURCHASER:** Remedies of Purchaser—Enforcement 3 of Vendee's Lien—Burden of Proof. A vendee who rescinds, and seeks to establish a lien on the land for his proper advancements, need not show that a subsequent title holder had knowledge of his (vendee's) rights. The subsequent title holder must show his want of knowledge.

Headnote 1: 39 Cyc. pp. 2031, 2037, 2041. Headnote 2: 39 Cyc. p. 2041. Headnote 3: 39 Cyc. p. 2042.

*Appeal from O'Brien District Court.*—WILLIAM HUTCHINSON, Judge.

FEBRUARY 16, 1926.

REHEARING DENIED MAY 14, 1926.

SUIT to establish vendee's lien. Decree for plaintiff. Defendants appeal.—*Affirmed.*

*Molyneux, Maher & Meloy,* for appellants.

*T. E. Diamond,* for appellee.

MORLING, J.—On March 1, 1920, the defendant C. A. Watts sold to plaintiff, Larson, a tract of land by contract in substitution of one previously existing, the terms of which need not be considered, further than to say that $10,000 was paid by plaintiff on the two contracts, and performance was to be, but was not, made March 1, 1921. On March 1, 1920, plaintiff took possession by a tenant, who remained on the farm until after the deed to Metcalf later referred to. On June 27, 1921, Watts gave notice of intention to declare a forfeiture, and on August 6, 1921, declared the forfeiture, and served notice of it. About the time of the service of notice of intention, the plaintiff, Larson, commenced an action at law against Watts, to recover the

1. VENDOR AND PURCHASER: remedies of purchaser: vendee's right to lien.

$10,000, and also to recover for material and labor expended on the land, and for commission paid on a loan, and for interest and taxes, alleging plaintiff's readiness and Watts's refusal to perform, and rescission by plaintiff. The case was submitted to a jury upon the questions of plaintiff's readiness and Watts's refusal to carry out the contract, and the amount to be awarded to plaintiff, if anything. The jury returned a verdict for the plaintiff, though for an amount considerably less than his claim. On September 25, 1922, judgment was entered on the verdict.

The defendant J. T. Metcalf is a banker, and, pending the action at law (on August 10, 1921), Watts conveyed the land to Metcalf. On January 16, 1924, the petition in this suit was filed, to establish a vendee's lien for the amount of the judgment.

Defendants submit three propositions: First, that in this state a vendee is not entitled to a lien. Second, even though a vendee may have a lien, still the plaintiff had an election between recovering at law and relying upon his lien, and by suing and recovering at law, he made his election, and waived claim to lien. Third, Metcalf is a purchaser in good faith, and the lien cannot be enforced against him.

I. Our attention has not been called to any opinion by this court in which the vendee's lien, under that name, has been referred to. Nevertheless, the equitable estate of the vendee in the land contracted for,—his equitable ownership, the foundation principle of the English and American cases which gives rise to the vendor's lien, and, on refusal of the vendor to perform, raises a vendee's lien,—has been the law of this state since the decision of *Pierson v. David,* 1 Iowa 23, to be presently referred to. In *In re Estate of Miller,* 142 Iowa 563, 566, it is said:

"The interest acquired by the vendee is 'land,' and the right and interest conferred by the contract upon the vendor is 'personal property.' In case of the death of the vendee, his interest in the land would descend to his heirs. In case of the death of the vendor, his interest would pass as personal estate to his administrator. A judgment against the vendee would become a lien on the land, inferior, of course, to the rights of the

vendor. A judgment against the vendor would not become a lien upon the land * * *''

In *O'Brien v. Paulsen,* 192 Iowa 1351, 1353, we accepted the English rule, as laid down in *Paine v. Meller,* 6 Ves. Jr. 349, by Lord Eldon, as follows:

''* * * for, if the party by the contract has become in equity the owner of the premises, they are his, to all intents and purposes. They are vendible as his, chargeable as his, capable of being incumbered as his; they may be devised as his; they may be assets; and they would descend to his heir.''

In *Cumming v. First Nat. Bank,* 199 Iowa 667, after referring to the *Miller* case, we said:

''The title in equity passed to the vendee. It is not dependent upon a conveyance nor the payment of the purchase money; nor is possession or delivery of possession a necessary incident.''

We take up first defendant's reasons for disputing the existence of a vendee's lien. He urges that a vendee's lien, where recognized, ''exists as a corollary of the vendor's lien,'' and that, as the vendor's lien is now by statute denied after a conveyance by the vendee, the vendee's lien must likewise be held to end with a conveyance by the vendor. The vendee's equitable title to the land is not a corollary of the vendor's equitable title to the purchase money. The vendee's lien upon the land for a return of the money that he has invested in it when the vendor refuses to perform is not a corollary of the vendor's lien upon the land for the purchase money. These respective estates and liens are correlative. They correspond. They are derived from the same principle, but neither is a corollary of or derived from the other. The fundamental principle of *Pierson v. David* results, as we shall see, in the giving of both liens. The destruction of one by the statute does not result in the destruction of the other merely because they have the same parentage. They may be twins, but they are not Siamese twins. The statute does preserve the principle, for it permits foreclosure by the vendor, and declares that the vendee, for the purpose thereof, shall be treated as a mortgagor. Sections 12382, 12383, Code of 1924. The vendor can protect his lien without the grace of the vendee, for he can, as the statute provides (Section 10057, Code of

1924), reserve it in the conveyance which he alone executes. The vendee has not similar protection. He must depend upon his possession and his equitable estate. To deny the vendor a lien after conveyance does not put him at the mercy of the vendee. To require restoration by the vendee on rescission for the vendor's fault, and then to deny the vendee a lien, open the way for a vendor to fraudulently appropriate the money paid or improvements made by the vendee, by merely conveying his legal estate to a confederate, or a purchaser with notice. The statute (Section 10057) refers to vendors' liens only. It does not abolish the vendor's lien, but restricts it. It does not impose these restrictions upon a vendee's lien, and it would be legislating to declare that the statute which applies to vendors' liens applies conversely to vendees' liens.

The statute relating to the vendor's lien first appeared in the Code of 1873, Section 1940. In *Pierson v. David*, 1 Iowa 23, this court said:

"Under our law, where so much strictness is required with regard to placing on the appropriate records evidences of liens and incumbrances, it would seem that, in the absence of fraud, courts should be careful in the recognition of this lien. And yet, there is much of good conscience, equity, and natural justice in providing that the vendor shall not be regarded as having lost all dominion over his property until he is paid the agreed price. This lien or trust, though formerly objected to, as being in contravention of the policy of the statute of frauds, and for other reasons, is now firmly established. Its necessity is, indeed, too apparent, the beneficial consequences too clear, and its equitable existence too well sustained, to need now either authority or reason, to prove its origin or design. * * * This vendor's lien, it must be borne in mind, however, is an equitable mortgage, and does not contemplate any writing to evidence it. A trust estate is created by the contract, whereby the purchaser becomes the trustee, and the vendor the *cestui que trust*. The payment is a part of the contract, and upon this, and the ground of good conscience, this equitable trust rests. This equitable lien, it is admitted, follows the property sold into the hands of the heirs, and even future vendees with notice."

This doctrine, including in it the right to a lien on the

property in the hands of subsequent purchasers with notice, was firmly established at the time of the adoption of the Code of 1873. The vendee was treated as the mortgagor, and his rights foreclosed in the same manner. *Blair & Co. v. Marsh*, 8 Iowa 144; *Grapengether v. Fejervary*, 9 Iowa 163; *Johnson v. McGrew*, 42 Iowa 555; *Jordan v. Wimer*, 45 Iowa 65; *McDole v. Purdy*, 23 Iowa 277. The right to the lien was held to be a part of the contract, which the legislature could not, by the Code of 1873, as to contracts then existing, impair. *Jordan v. Wimer*, 45 Iowa 65; *Webster v. McCollough*, 61 Iowa 496. See, also, *Wightman v. Spofford*, 56 Iowa 145. This lien was held to survive the filing and allowance of a claim against the vendee's estate. *Hays v. Horine*, 12 Iowa 61. Under the circumstances in *Patterson v. Linder*, 14 Iowa 414, it was held to survive a judgment against the vendee. It is the general rule that the vendor's lien is good as against a purchaser with either actual or constructive notice. 39 Cyc. 1822. The Code commissioners, in order to cut off a secret lien (a lien which, as has been noted, was not necessary for the protection of the vendor), recommended the passage of Section 1940. Annotations, Code of Iowa, Vol. I, page 821.

The vendor need not divest himself of the legal title except by his voluntary act, and then, by a conveyance, voluntarily place the vendee in the position of apparent ownership. The reason for the adoption of Section 1940 does not apply to a vendee. As the vendee makes his payments, the vendor becomes trustee for him of the legal estate, and the vendee becomes, in equity, the owner of the estate to the extent of his payments. When the payments are fully made, the full equitable title vests in the vendee, and the vendor retains the naked legal title in trust for him. *Rose v. Watson*, 10 H. L. Cas. 672 (10 Jur. [N. S.] 297).

"A deposit is part payment. Therefore, part payment *to that extent* constitutes the purchaser actually owner of the estate. Consequently, if the contract do not proceed without the fault of the purchaser, the seller, to recover the equitable ownership, must repay the deposit, which, representing a portion of the interest in the property, is a lien upon it." 2 Sugden on Vendors (14th Ed.) 672. *Elterman v. Hyman*, 192 N. Y. 113,

124, 125 (84 N. E. 937, 941, 127 Am. St. 862, 15 Ann. Cas. 819).

"The legal title remains in the vendor, while an equitable interest vests in the vendee, to the extent of the payments made by him. As his payments increase, his equitable interest increases; and when the contract price is fully paid, the entire title is equitably vested in him, and he may compel a conveyance of the legal title by the vendor, his heirs, or his assigns. The vendor is a trustee of the legal title for the vendee to the extent of his payment. The result of this state of things is quite unlike that of a conveyance subject to a condition subsequent which is broken, and when re-entry or a claim of title for condition broken is necessary, to enable the vendor to restore to himself the title to the estate. The legal title having, in that case, passed out of him, some measures are necessary to replace it. In the case of a contract like that we are considering, no legal title passes. The interest of the vendee is equitable merely, and whatever puts an end to the equitable interest * * * places the vendor where he was before the contract was made." (Written with reference to the vendor's rights.) *Jennisons v. Leonard,* 21 Wall. (U. S.) 302, 309.

For further authorities, see cases cited in 39 Cyc. 2033 *et seq.* The vendee's lien will prevail against the subsequent grantee of the vendor with notice. *Lowe v. Maynard* (Ky.), 115 S. W. 214; *Rose v. Watson,* 10 H. L. Cas. 672; *Stewart v. Wood,* 63 Mo. 252; *Clark v. Jacobs,* 56 Howard's Practice 519, cited in note to 3 Pomeroy's Equity Jurisprudence (4th Ed.) 3050, Section 1263; 39 Cyc. 2040.

In this case, the judgment is conclusive that plaintiff was ready, and that Watts refused to perform the contract. The plaintiff had paid his money to Watts and had improved the property in reliance upon the contract, and had acquired an equitable estate in the land to the amount of his payments and improvements and other proper expenditures. To deny a lien (which in this case would apparently be against an insolvent, nonperforming vendor, and against one who takes the title from him with notice of the vendee's equity) would be, as it seems to us, to put a premium upon the perpetration of fraud by a vendor and by those who are willing to collude with him. It seems to us, therefore, that the vendee's lien is not only just,

and well supported on principle and by the great weight of authority, but that, in substance, it is a part of the equity jurisprudence of this state. For leading authorities upon the vendee's right to a lien, consult 3 Pomeroy's Equity Jurisprudence (4th Ed.), Section 1263; *Flickinger v. Glass*, 222 N. Y. 404 (118 N. E. 792); *Witte v. Hobolth*, 224 Mich. 286 (195 N. W. 82); *Gerstell v. Shirk*, 127 C. C. A. 41 (210 Fed. 223); *Everett v. Mansfield*, 78 C. C. A. 188 (148 Fed. 374); 39 Cyc. 2031.

II. The lien is to secure to the vendee the repayment of his expenditures made in pursuance of the contract. The amount may be ascertained, and the liability of the vendor therefor determined at law. The ascertainment of the amount of the expenditures and the determination of the vendor's liability to make restoration are not inconsistent with the existence of or right to enforce the lien. There is no splitting of causes of action and no merger of the lien in the judgment and no waiver. *Sigworth v. Meriam*, 66 Iowa 477; *Gilman v. Heitman*, 137 Iowa 336; *Freeburg v. Eksell*, 123 Iowa 464; *Flickinger v. Glass*, 222 N. Y. 404 (118 N. E. 792); *Bierce v. Hutchins*, 205 U. S. 340; *Erickson v. Russ*, 21 N. D. 208 (129 N. W. 1025, 32 L. R. A. [N. S.] 1072; *Lambert v. Nicklass*, 45 W. Va. 527 (72 Am. St. 828); *Love v. Caylor*, 99 Okla. 302 (227 Pac. 98).

2. VENDOR AND PURCHASER: remedies of purchaser: election of remedies.

III. As stated, plaintiff's tenant was in possession. Plaintiff testified that, on July 7, 1921, Metcalf and the cashier, Raw, had an interview with him, in which Metcalf "asked me what the trouble was between Watts and me. * * * I told Metcalf that I had purchased a piece of land from Watts, and that I had paid him money down, and that Watts had refused, from time to time, to deliver a deed to me, and that, even when I refused to sign the second contract, he went up to the house and wanted my wife to sign it; and Mr. Metcalf said, 'Why, that is strange Charley [Watts] would do that.' And then I told Metcalf that, if I didn't get the deed, that I was intending to start an action to recover my money. I told Metcalf at that time that I had paid Watts $10,000. I don't remember whether Metcalf said very much of anything. Raw said he didn't think I had much of a case. He said Tobe Diamond could make a

case "out of anything. This was after I had commenced my action against Watts. This was in July, and I had commenced my action in June; so I say that the trouble Metcalf referred to between Watts and me was the lawsuit. I had another talk with Metcalf in August,—the 10th day of August. * * * Metcalf asked me again about the Watts trouble, and I told him; and he said Watts had come to him and wanted to give him a deed for the farm in controversy, and that Metcalf said Watts had offered him [Metcalf] a deed as security on $9,000. Metcalf said Watts owed $4,000, I believe, at Merrill, and $5,000 at Paullina; and Metcalf said, if he accepted the deed, it was up as security to that indebtedness. I told Metcalf that I had not relinquished my right on the farm; that, if I got a judgment against Watts, that, if he didn't pay, I would levy on the farm, and try to get it that way. I got an opinion before that time from you, Mr. Diamond, as to what my rights were. * * * I told Metcalf what you had said: that I should bring the action first before a jury, and get the judgment, and then, if Watts didn't pay the judgment, why, you would start an action in equity court. Metcalf said that the only reason that he would ever expect a deed for that place would be as security on what Watts owed him. Metcalf did not tell me, at that time that he was buying the land, or anything of that sort.''

Watts testified:

''Mr. Metcalf's bank was asking for some security for the money I owed them. I told Metcalf that I expected to get some notes from Mr. Larson and a mortgage, and when I got them, I would put them up for security * * * I had a later conversation with Metcalf, when I tried to deliver the deed, Exhibit 1, and intended to get the mortgages from Larson; and I then told Metcalf that I was not going to get them. I later had a conversation with Metcalf, and told him, owing to the fact that I was not getting the mortgages, that the best thing I could do was to deed him the land. * * * This was along about the latter part of July, 1921, when it looked as though Mr. Larson was going to complete his contract. Later, I went to the bank and told them I was at their mercy, and that the only thing I had was this piece of land, and that, if they would cancel my notes, I would give them the land. I gave them a deed on the

10th of August, 1921, and they gave me a receipt for the note. * * * The bank said they wanted to see about the title, and so I think they called up Mr. Rerick, of Primghar, to see if there was anything against the land, other than the $18,000 first mortgage. * * * I gave the bank an abstract, and they looked the matter over. * * * they were satisfied with it. * * * I told Metcalf that the mortgage I expected from Larson would be a mortgage covering the farm in controversy. * * * I don't know as I went in to Metcalf and honestly and clearly gave him my trouble * * * I told Metcalf I served a notice of forfeiture on the land contract.''

Metcalf testified:

''I do not remember of having any talk with him [plaintiff] with reference to his deal with Watts. * * * At that time, Watts owed us more than $9,000. I don't remember that I ever had any conversation with Larson with reference to his land contract with Watts. I don't remember of him, ever mentioning the land. If he ever did, it was a year or two after I took the deed from Watts. * * * To the best of my recollection, on August 10, 1921, I was at the bank in Paullina, when I took deed from Watts. I don't believe I ever was at Larson's place on the 10th of August, 1921. * * * At the time I took this deed from Watts, I did not have any knowledge that Larson had any interest in this land, or claimed to have any interest in the land. Before turning the notes Exhibits 7 and 8 over to Mr. Watts, I called up Mr. Rerick [abstracter at Primghar], with reference to the title, and asked him to find out if there was any judgment or any claims whatsoever on this farm, * * * and he said that the farm was clear from all claims, except the $18,000 mortgage * * * The abstract was continued to about the first of December, 1921. That abstract at that time did not disclose anything about this suit that is now being tried, or any claim of Larson to this land. * * * Larson, the plaintiff, did not dispute our right to the rent in any way. He never claimed to me that he owned any interest in the land or had any right to the rent, at that time. * * * I had no agreement in any form * * * to deed the land back to Watts. I was acquainted with the farm in controversy in 1921, and knew there was a tenant on the place. Before I got deed to the land, I did not talk to the

tenant as to who his landlord was. I did not talk to Larson with respect to what rights he claimed to the land. * * * I knew, at the time we took deed, that Larson was starting action against Watts; that there was an action pending between Larson and Watts. I didn't know that it was concerning the land deal between them. I didn't know what it was about. * * * I did not go to a lawyer and ask legal advice as to the possible rights of Larson under this suit before I took the deed from Watts. * * * I suppose it was not surprising to me that, if Mr. Larson claimed to have a lien on the land, that he was not claiming the rent from the land.''

Rerick testified that he continued the abstract for Raw, and that Raw ''wanted to know if there was not some case there, and he thought there was a case pending there. Well, I either went and looked it up, or I had it looked up, and I told him I thought not; that I didn't find any. I don't know whether I overlooked at the time, or whether I thought, as I will explain a little later on. I think, how that happened, * * * I didn't find anything in the records * * * that affected the title to the land, or any claim which was of record * * * I think I probably found the record of the law action between Larson and Watts.''

The witness stated that the abstract was made in his office July 5, 1921, signed by his son, and that the son knew about the pendency of the suit as early as July 5, 1921. The abstract certified July 5, 1921, shows the petition filed June 29, 1921, stating that plaintiff held contract for the land, and that the contract was not fulfilled, and that plaintiff was asking judgment for $14,256.88.

Neither Raw nor the abstracter's son was called as a witness.

The evidence, in our opinion, justifies the finding that Metcalf, before he took the deed, knew that plaintiff had made a large payment on this land; that there was a controversy between plaintiff and Watts; that plaintiff was suing to recover $14,256.88, and was claiming that the farm would be held as security for the payment of the amount of his recovery. He knew, or ought to have known, that plaintiff's money was in the land. If we were to accept the defendant's testimony, he had constructive notice, and was also put upon inquiry, which, if followed out, would have led to a discovery of plaintiff's claims.

*Crooks v. Jenkins,* 124 Iowa 317; *Aultman & Taylor Mach. Co. v. Kennedy,* 114 Iowa 444. The burden of proof was upon Metcalf to show that he was without notice, actual or constructive. In our opinion, he had both actual and constructive notice. *Flickinger v. Glass,* 222 N. Y. 404 (118 N. E. 792); 20 Ruling Case Law 349; *Doran v. Dazey,* 5 N. D. 167 (64 N. W. 1023, 57 Am. St. 550).

*3. VENDOR AND PURCHASER: remedies of purchaser: enforcement of vendee's lien: burden of proof.*

The judgment is—*Affirmed.*

DE GRAFF, C. J., and EVANS and ALBERT, JJ., concur.