Larry L. PIERCE and Jeri
L. Pierce, Appellees,

v.

FARM BUREAU MUTUAL INSURANCE
COMPANY, Appellant.

No. 95–677.

Supreme Court of Iowa.

May 22, 1996.

Gregory A. Witke, Barbara A. Hering, and Cynthia A. Hurley, of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellant.

Thomas R. Isaac, Des Moines, and Michael H. Adams, Des Moines, for appellee.

Considered by McGIVERIN, C.J., and CARTER, LAVORATO, NEUMAN, and ANDREASEN, JJ.

LAVORATO, Justice.

Farm Bureau Mutual Insurance Company issued a homeowners policy to Larry L. and Jeri L. Pierce. One of the provisions in the policy provided dwelling replacement cost coverage for property damaged or destroyed by fire under certain conditions. The policy specified a time frame for making a claim under this provision after the insureds suffered a covered loss. Fire damaged the Pierces' lake dwelling. At the Pierces' request, Farm Bureau extended the claim filing deadline so the Pierces would have more time to make their claim.

The Pierces found a substitute dwelling which was owned by Paul and Anna Martin. The Martins are Jeri Pierce's parents. The Pierces entered into a written real estate purchase contract with the Martins and took possession before the claim filing deadline. It is undisputed that the Pierces neither made the down payment nor any monthly installment payments before the deadline expired.

The primary issues are whether the Pierces (1) made a bona fide replacement, and (2) actually spent money to replace the damaged dwelling, thereby triggering the replacement cost provision. The district court determined the Pierces made a bona fide replacement and actually spent money to replace the damaged dwelling. We affirm.

I. *Background Facts.*

Before trial the parties stipulated to the following facts. On September 15, 1988, Farm Bureau issued a homeowners policy to the Pierces on their lake dwelling located in Ringgold County. The policy contained a dwelling replacement cost coverage provision. This provision furnished coverage in the amount of $64,200. The policy required claims under this provision to be made within 180 days after the loss.

On January 6, 1992, Farm Bureau modified the Pierces' original policy by increasing the replacement cost coverage limit to $80,000. About ten weeks later, on March 21, 1992, a fire damaged the Pierces' lake dwelling.

On or about May 14, 1992, the Pierces submitted their claim for damages and proof of fire loss to Farm Bureau. On or about August 21, 1992, Farm Bureau paid the Pierces $45,120. This was the actual cash value of the dwelling less the $100 deductible.

The replacement cost coverage provision required the Pierces to replace the damaged dwelling by September 17, 1992. At the Pierces' request, Farm Bureau extended the deadline for such replacement to January 19, 1993.

On November 19, 1992, the Martins completed a survey plat of their property located in Jefferson County. On December 18, 1992, the Pierces and the Martins executed a short form Iowa State Bar Association real estate contract on this property. The Martins' attorney prepared the contract, which identi-

fied the Pierces as purchasers and the Martins as sellers. The total purchase price of the property was $125,000. The Pierces and the Martins signed the contract before a notary. The parties recorded the contract on the extended deadline date—January 19, 1993.

Contract terms called for the Pierces to make a down payment of $40,000 on or about January 3, 1993, the date set for transfer of possession and closing. The contract also called for the Pierces to pay the remaining $85,000 in monthly installments of $500 commencing February 1, 1993, and ending February 1, 2001. At that time, any unpaid principal and interest would be due and owing.

No money changed hands on the real estate purchase on or before January 19, 1993. Between March 7, 1993, and March 9, 1993, the Pierces paid the Martins $40,000 by check. The check was backdated to December 18, 1992. The Martins cashed the check on March 9.

The Pierces continued to seek replacement cost benefits from Farm Bureau for the Jefferson County real estate. On April 26, 1993, Farm Bureau notified the Pierces by letter that it was rejecting their claim for benefits under this policy provision. In the letter Farm Bureau rejected the Pierces' claim because they failed to spend any amounts to repair or replace the damaged dwelling before the January 19, 1993, extended deadline.

The Martins served the Pierces with a notice of forfeiture on the real estate contract on November 22, 1993. *See* Iowa Code ch. 656 (1993). In the notice the Martins alleged the Pierces failed to make the $40,000 down payment due January 3, 1993, and any of the $500 monthly payments.

## II. *Background Proceedings.*

The Pierces filed a four-count petition against Farm Bureau on April 30, 1993. Counts I and II were for breach of contract. Count III was for fraudulent misrepresentation. Count IV was for negligent misrepresentation. Count V was for bad faith.

Farm Bureau answered, asserting the affirmative defenses of (1) failure to state a cause of action, (2) failure to comply with the terms of the insurance policy, and (3) reliance on advice of counsel in rejecting Pierces' claim. By agreement of the parties, the Pierces voluntarily dismissed all but the Count I breach of contract claim.

The parties submitted the case to the court in a bench trial on a joint stipulation of facts. Later, the court entered a judgment order adverse to Farm Bureau and in favor of the Pierces for $34,780.

Farm Bureau appeals from the district court's adverse judgment order.

## III. *Scope of Review.*

 Our review of actions filed at law is on error. Iowa R.App.P. 4. The district court's findings of fact have the force of a special verdict and are binding upon us unless they are not supported by substantial evidence. *Waukon Auto Supply v. Farmers & Merchants Sav. Bank,* 440 N.W.2d 844, 846 (Iowa 1989). Evidence is substantial if a reasonable mind could find it adequate to reach the same findings. *Id.* Although the district court's findings of fact are binding on us, its conclusions of law are not. *R.E.T. Corp. v. Frank Paxton Co.,* 329 N.W.2d 416, 419 (Iowa 1983).

## IV. *Bona Fide Replacement and Monies Actually Spent.*

Farm Bureau contends the replacement cost coverage provision required the Pierces to (1) complete replacement of their damaged dwelling by the January 19, 1993, extended deadline and (2) actually spend money to replace the property within that period. Farm Bureau vigorously asserts that the Pierces made no bona fide replacement of the property by January 19, 1993—the extended deadline. And Farm Bureau asserts the Pierces actually spent no money to replace the property by such date.

Replacement cost insurance, sometimes called depreciation insurance,

pays for full replacement cost new of the insured property, without deduction for depreciation. It provides indemnity for the

expenditures the insured is obligated to make over and above the amount of the loss covered by full insurance under the standard fire policy in order to restore the property to its full usefulness as before the loss or damage. [Replacement cost insurance] substitutes a figure representing the cost of replacement new for the term "actual cash value."

*Higgins v. Insurance Co. of North Am.*, 256 Or. 151, 469 P.2d 766, 772 (1970) (en banc) (citation omitted).

A. *Replacement cost provision and its meaning.* We begin our analysis with the replacement cost provision of the policy to determine what it required the Pierces to do. The provision states:

3. **Loss Settlement.** Covered property losses are settled as follows:

. . . .

b. Buildings under Coverage A [residence] or B [other structures on the premises] at replacement cost without deduction for depreciation, subject to the following:

(1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

(a) the limit of liability under this policy that applies to the building;

(b) the replacement cost of that part of the building damaged for like construction and use on the same premises; or

(c) *the necessary amount actually spent to repair or replace the damaged building.*

. . . .

(4) We will pay no more than the actual cash value of the damage unless:

(a) *actual* repair or *replacement is complete;* or

(b) the cost to repair or replace the damage is both:

(i) less than 5% of the amount of insurance in this policy on the building; and

(ii) less than $2,500.

(5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability on a replacement cost basis.

(Emphasis added.)

The parties agree a condition precedent to recovery by the Pierces is that "replacement" must be "complete" under the replacement cost coverage provision. *See* Randy R. Koenders, *Construction and Effect of Property Insurance Provision Permitting Recovery of Replacement Cost of Property,* 1 A.L.R.5th 817, 829 (1992) ("Generally, actual replacement of damaged or destroyed property has been held to be a prerequisite to collection of proceeds under a replacement cost endorsement of an insurance policy."). The reason for this "actual replacement" condition precedent is to prevent the insured from "mak[ing] a profit out of his loss . . . ." 6 John A. & Jean Appleman, *Insurance Law & Practice* § 3823, at 20 n. 66.57 (Supp.1995).

The parties also agree that, upon completion of replacement, recovery is limited to the lesser of (1) the limit of liability, (2) the replacement cost of that part of the building damaged for like construction and use on the same premises, or (3) the necessary amount actually spent to repair or replace the damaged building. What is contemplated under a replacement cost provision is that, ordinarily, actual cash value will be less than replacement cost. The insurer will first pay the lesser amount—actual cash value. Upon completion of replacement within 180 days after the loss, the insurer will pay the difference between actual cash value and replacement cost. *See State Farm Fire & Cas. Co. v. Ponder,* 469 So.2d 1262, 1266 (Ala.1985) (per curiam).

 The policy does not define "replacement" or "complete." When the policy leaves contested terms undefined, we resort to well-known rules of policy interpretation

to supply the missing information. First, interpretation of policy provisions here is a legal question for the court. *A.Y. McDonald Indus., Inc. v. Insurance Co. of North Am.,* 475 N.W.2d 607, 618 (Iowa 1991). Second, the intention of the parties ultimately controls our interpretation. *Id.* Third, we give undefined terms their ordinary meaning. *Hofco, Inc. v. National Union Fire Ins. Co.,* 482 N.W.2d 397, 401 (Iowa 1992). Finally, in searching for the ordinary meaning of undefined terms, we commonly refer to dictionaries. *A.Y. McDonald,* 475 N.W.2d at 619.

■ "Replace" is commonly understood to mean supplant with a substitute or equivalent. Black's Law Dictionary 1299 (6th ed. 1990). "Complete" means full or entire. *Id.* at 285. Complete replacement, then, is full or entire supplanting with a substitute or equivalent.

B. *The issues.* We see the case turning on two questions. First, did the Pierces fully or entirely supplant their damaged dwelling with a substitute or equivalent dwelling when they executed the real estate contract with the Martins? Or, in policy terms, did the Pierces actually and completely replace their damaged dwelling when they executed the contract? Second, did the Pierces actually spend $125,000—the purchase price in the contract—when they executed the contract?

■ Resolving these questions requires an understanding of an executory real estate contract. According to a noted property commentator,

> [t]he legal cliche, that equity treats that as being done which should be done, is the basis of the theory of equitable conversion. Hence, when the vendee contracts to buy and the vendor to sell, though legal title has not yet passed, in equity the vendee becomes the owner of the land, [and] the vendor of the purchase money. In equity the vendee has a real interest and the vendor a personal interest. Equity treats the executory contract as a conversion, whereby an equitable interest in the land is secured to the purchaser for whom the vendor holds the legal title in trust. This is the doctrine of equitable conversion.

> By the doctrine of equitable conversion under an executory contract of sale, the equitable estate, in its entirety, passes immediately to the purchaser at the moment the contract becomes effective and the bare legal title for security purposes remains in the vendor. The purchaser of the land is looked on and treated as the owner thereof, and the vendor, though holding the legal title, holds it as a trustee for the purchaser, and the vendee holds the purchase money in trust for the vendor.

8A George W. Thompson, *Thompson on Real Property* § 4447, at 273–75 (Grimes ed. 1963) [hereinafter *Thompson* ]. Iowa follows the equitable conversion doctrine. *See Larson v. Metcalf,* 201 Iowa 1208, 1210–11, 207 N.W. 382, 383 (1926).

Although the parties sign a written executory real estate contract,

> [the contract] is unenforceable unless it shows a consideration of benefit moving to the vendor, or detriment to the purchaser or agreement on his part to purchase the property. The rule is well settled that a court of equity will not decree a specific performance of a contract that is not supported by a valuable consideration. Price is a necessary element to every enforceable contract for sale of lands under the statute of frauds. A "valuable consideration" may be something other than the actual payment of money and may consist of acts to be done after the conveyance.

> ... The consideration may be the payment of money, the performance of some other benefit, or *nothing more than the promise to do such stipulated act in the future.*

*Thompson* § 4453, at 314–16 (emphasis added); *accord Holland v. Hensley,* 4 Iowa (4 Clarke) 222, 227–28 (1857). If there is "valuable consideration" supporting the executory real estate contract, the contract becomes effective and the parties are bound on the date they execute it. *Thompson* § 4447, at 279; *O'Brien v. Paulsen,* 192 Iowa 1351, 1353–54, 186 N.W. 440, 441–42 (1922) (vendee held responsible for loss of buildings destroyed by lightning occurring between date of contract execution and possession).

■ Vendors have various remedies when a vendee is in default under the executory real estate contract. Vendors have

a right to elect whether (1) to keep good their tender of performance, demand the balance of the purchase price and sue for specific performance; (2) to terminate the contract because of the vendee's breach, keep their land and sue for damages for the breach; (3) to rescind the contract in toto; or (4) to enforce a forfeiture under the statute.

*Abodeely v. Cavras*, 221 N.W.2d 494, 497–98 (Iowa 1974).

On its face the executory real estate contract here appears to be binding from the date of its execution, December 18, 1992. Under the contract, the Martins agree to sell and the Pierces agree to buy the property. Regarding the purchase price, the contract pertinently provides that

A. A payment of $40,000 shall be made on or about January 3, 1993, the date possession transfers and the date of closing.

B. The balance of $85,000 shall be payable at the rate of $500.00 per month commencing on February 1, 1993, and continuing to February 1, 2001, at which time the entire unpaid balance, principal, and interest, shall be due and payable. Payments when made shall be first applied to accrued interest and then principal.

In the event of default by the Pierces, the contract gives the Martins the option of forfeiting the contract in accordance with the Iowa Code (chapter 656) and keeping all payments made. In addition, the contract gives the Martins the option to declare the balance of the purchase price immediately due and payable, foreclose the contract against the property, sell the property at a sheriff's sale, and obtain a deficiency judgment for the unsatisfied portion of the judgment. Finally, the contract provides that the Martins are "entitled to utilize any and all other remedies or actions at law or in equity available to them."

■ C. *The merits.* Given the foregoing discussion about executory real estate contracts, we reach two conclusions concerning such contracts and the replacement cost provision under consideration. First, such contracts satisfy the "actual and complete" replacement requirement of the replacement cost provision. Second, the obligation the insureds incur by virtue of such contracts satisfies the "money actually spent" requirement of the provision.

Farm Bureau has no quarrel with these two conclusions. Farm Bureau concedes they correctly describe the legal effect of executory real estate contracts upon the actual and complete replacement requirement and the moneys actually spent requirement in its policy.

■ But Farm Bureau thinks the contract between the Pierces and the Martins is not what it seems to be. Farm Bureau insists the Pierces did not make a bona fide replacement of the property by January 19, 1993— the extended deadline date—because the contract was not a legitimate arm's length transaction. To support its contention, Farm Bureau points to the fact that the contract was filed on the last day of the deadline extension and was executed between family members.

Farm Bureau points to other facts to support its contention that the contract was not a legitimate arm's length transaction. First, the Pierces back-dated the $40,000 check from March 7, 1993, to December 18, 1992— the date of the contract—to make it appear that the down payment was made before the January 19, 1993, extended deadline.

Second, the Pierces did not make the $40,000 down payment on the date called for by the contract. In fact, the Pierces never made the $40,000 down payment. Nor did they make the monthly payments called for by the contract. (The parties stipulated that the Martins cashed the $40,000 check on March 9, 1993—two days after the Pierces wrote the check.) To support these contentions, Farm Bureau relies on the following language in the forfeiture notice:

(a) You have failed to make the $40,000 payment due on January 3, 1993.

(b) You have failed to make monthly payments in the amount of $500 per month

commencing February 1, 1993 through November 1, 1993.

The district court certainly could have relied on these stipulated facts and found as an ultimate fact that the Pierces and the Martins did not intend a binding contract when they executed the agreement. Had it done so, the court could have concluded that the Pierces had not actually and completely replaced their damaged dwelling by January 19, 1993, the deadline extension date. In addition, the court certainly could have concluded that the Pierces had not spent $125,-000 because they had not obligated themselves to pay the contract purchase price.

But the district court did not make such findings. Instead, the court found:

To begin with, this contract was made on a form produced by the Iowa Bar Association, had all the essentials for a valid contract, was signed by the [Pierces] and Martins in the presence of a notary public, and the same was filed with the recorder of Jefferson County, Iowa where the substitute real estate was located. It is well-settled in Iowa that such a conveyance creates obligations to the parties to it, and the same is valid and binding on the parties even though it is not recorded. Consequently, at the time of its execution, this contract created legal and binding obligations upon the [Pierces] and [the] Martins.

Further, at the time of filing of this contract with the Jefferson County recorder, the fact of filing gave notice to the general public that the [Pierces] have an interest in the land. The fact that the Martins undertook to forfeit this contract under the provisions of Iowa Code chapter 656 further evidences the validity of this contract.

. . . .

In short, when the validity of the contract mattered to the parties to this action, on or before January 19, 1993, this was a valid real estate contract in accordance with the laws of the state of Iowa which went beyond a mere "intent" to replace.

. . . .

. . . The defense of fraud was raised by [Farm Bureau] in its reply brief, and the court finds that such defense was raised as a last chance to justify its denial of [the Pierces'] claim under the policy. The court further finds that there is no evidence in the record which supports such a defense, and that [the Pierces] have not engaged in fraudulent conduct.

(Citation omitted.)

As the district court noted, the critical question is whether the Pierces and the Martins intended to be bound when they executed the contract. The court found that they did. Farm Bureau does not contend there was not sufficient evidence in the record to support this finding. Rather, it asks us to find as a matter of law that the parties did not intend to be bound. Given the facts the district court cited, we are unable to say that reasonable minds could reach but one conclusion: that the parties did not intend to be bound. *See Bluffs Dev. Co. v. Board of Adjustment,* 499 N.W.2d 12, 14 (Iowa 1993) (facts are established as a matter of law if "reasonable minds could reach but one conclusion").

Concerning the forfeiture and Farm Bureau's contention that the Pierces' default somehow made the contract nonbinding, the district court concluded otherwise:

Parenthetically, the record presented to the court shows only that a notice of forfeiture of real estate contract was served upon the [Pierces]—it does not amount to proof that the contract was in fact forfeited. Such a notice is merely an *allegation* that [the Pierces] breached a *valid* contract, which may entitle the contract sellers, not [Farm Bureau], to a remedy if they desire to seek a remedy. If the [Pierces] . . . managed to obtain a forbearance from the Martins, such a matter is between the [Pierces] and Martins, and does not concern [Farm Bureau].

Our case law supports the district court's conclusions. A party may waive a condition precedent to the party's own performance of a contractual duty without affecting the validity of an executory real estate contract. *H.L. Munn Lumber Co. v. City of Ames,* 176 N.W.2d 813, 816 (Iowa 1970). In addition,

the mere passage of thirty days does not automatically work a forfeiture of the real estate contract under Iowa Code section 656.5 (vendor may forfeit contract thirty days after notice to buyer to cure default). After serving notice of forfeiture, the seller may waive time for performance and thereby waive any forfeiture right under the notice. *See Gottschalk v. Simpson,* 422 N.W.2d 181, 184 (Iowa 1988).

### V. *Disposition.*

The parties agree that if the Pierces made a complete replacement under the policy through execution of the real estate contract, then Farm Bureau would be obligated to pay the Pierces the following: the lesser of the amount the Pierces actually spent to complete replacement of the dwelling and the policy limits of $80,000. Because the Pierces obligated themselves to pay $125,000 for the replacement dwelling, that is the amount they actually spent. Farm Bureau has already paid the actual cash value of $45,220 less the $100 deductible. Farm Bureau's obligation is therefore $34,880. This is the difference between the policy limits ($80,000) and the amount Farm Bureau has already paid ($45,220), less the deductible ($100).

We note the amount Farm Bureau actually owes is $100 more than the judgment entered by the district court. Because the Pierces make no challenge to the amount of the judgment, we affirm the judgment order in the amount of $34,780.

**AFFIRMED.**