# STATE OF MICHIGAN

# COURT OF APPEALS

DEBRA BATTON-JAJUGA,

        Plaintiff-Appellee,

v

FARM BUREAU GENERAL INSURANCE
COMPANY OF MICHIGAN,

        Defendant-Appellant.

FOR PUBLICATION
December 21, 2017
9:00 a.m.

No. 334130
Livingston Circuit Court
LC No. 15-028647-CK

Before: MURPHY, P.J., and KELLY and SWARTZLE, JJ.

SWARTZLE, J.

Defendant Farm Bureau General Insurance Company of Michigan (Farm Bureau) insured real property owned by plaintiff Batton-Jajuga, and the property was destroyed in a fire. Batton-Jajuga had indemnification coverage as well as replacement-cost coverage. When she attempted to replace her destroyed property with different property purchased with a land contract, Farm Bureau refused to pay any replacement costs. Farm Bureau claimed that Batton-Jajuga's interest in the new property was less than a fee simple and therefore was not a "complete" replacement.

Farm Bureau breached the insurance agreement by refusing to pay. While a vendee to a land contract does not immediately acquire a full fee simple in the real property, the vendee does become the equitable owner of the property when the contract becomes effective, and this was sufficient under the law and the parties' agreement. Accordingly, we affirm the trial court's grant of summary disposition to plaintiff.

## I. BACKGROUND

The relevant facts are not in dispute. Farm Bureau insured Batton-Jajuga's real property located in Monroe, Michigan up to $289,000. The parties' agreement included two types of property coverage: (1) indemnification up to the depreciated value of the property (i.e., the actual cash value); and (2) replacement-cost coverage (i.e., the full cost of repair or replacement above the actual cash value). With respect to replacement-cost coverage, the parties' agreement provided in pertinent part:

5. **Loss Settlement.** Covered property losses are settled as follows:

\* \* \*

-1-

b. Buildings under Coverage A or Coverage B at replacement cost . . . subject to the following:

(1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of the deductible and without deduction for depreciation, but not more than the least of the following:

(a) the limit of liability under this policy that applies to the building;

(b) the replacement cost of that part of the building damaged for like construction and use on the same premises; or

(c) the necessary amount actually spent to repair or replace the damaged building.

\* \* \*

(4) We will pay no more than the actual cash value of the damage, unless:

(a) actual repair or replacement is complete; . . . .

A fire destroyed Batton-Jajuga's property in October 2014. The parties agreed that the replacement-cost value of the loss was $179,811.23, and Farm Bureau promptly paid Batton-Jajuga $93,000 (the actual cash value of the destroyed property minus a $1,000 deductible). After adjusting for an additional $1,085.33 in non-recoverable depreciation, Farm Bureau held back the remaining $83,725.90 while Batton-Jajuga attempted to identify a replacement property.

In April 2015, Batton-Jajuga located replacement property in Pinckney, Michigan. She purchased the property by land contract for $200,000, with $40,000 paid immediately as a down payment and the remaining balance to be paid with monthly installments over 15 years. While an initial version of the land contract made the sale contingent on Farm Bureau paying replacement costs to Batton-Jajuga, that provision was removed from the final version. The version executed in June 2015 made the sale unconditional and provided that, in the event of default, the vendor had the right to declare a forfeiture of the property and take immediate possession as well as seek payment of any unpaid balance due under the contract. The contract further stated, "The Land Contract can be paid off in full at anytime with no pre-payment penalty."

Several days after she purchased the Pinckney property, Batton-Jajuga submitted a claim with Farm Bureau for the remaining $83,725.90. Given the lack of any prepayment penalty, she suggested that Farm Bureau could pay the remaining amount directly to the vendor to reduce the balance owed on the land contract. Farm Bureau refused, asserting that Batton-Jajuga had "spent nothing to repair or replace the damaged building" and that "[a]cquisition of another property under a land contract does not constitute 'replacement' of the damaged building within the meaning" of the replacement-cost coverage provision. Farm Bureau subsequently clarified that

"the documents supplied [by Batton-Jajuga] suggest an expenditure by [her] of $40,000 under the land contract," but otherwise the company maintained that its position remained unchanged.

Batton-Jajuga sued Farm Bureau for breach of contract and sought damages of $83,725.90 as well as additional consequential and incidental damages. She later moved for summary disposition under MCR 2.116(C)(10) and in its response, Farm Bureau likewise sought summary disposition under MCR 2.116(I)(2). The trial court granted Batton-Jajuga summary disposition and awarded her the replacement-cost amount as well as statutory interest and fees, but the trial court denied her any additional damages or contractual attorney fees.

Farm Bureau appealed as of right.

## II. ANALYSIS

### A. STANDARD OF REVIEW

On appeal, this Court reviews de novo a trial court's ruling on summary disposition. Summary disposition is appropriate under MCR 2.116(C)(10) when, except as to damages, "there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." We construe the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to Farm Bureau as the non-movant. *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008). This Court also reviews de novo questions of law, including the meaning of statutes and contracts. *Oakland Co Bd of Co Rd Comm'rs v Mich Prop & Cas Guaranty Ass'n*, 456 Mich 590, 610; 575 NW2d 751 (1998); *Reed v Reed*, 265 Mich App 131, 141; 693 NW2d 825 (2005).

Our duty in interpreting a statute or a contract is to give effect to the intent of the drafter. *Van Buren County Educational Ass'n v Decautor Public Schools*, 309 Mich App 630, 643; 872 NW2d 710 (2015); *In re Smith Trust*, 274 Mich App 283, 285; 731 NW2d 810 (2007). In both the statutory and contractual contexts, the drafter is presumed to intend the meaning clearly expressed, and this Court gives effect to the plain, ordinary, or generally accepted meaning of the drafter's words. *Terrien v Zwit*, 467 Mich 56, 76-77; 648 NW2d 602 (2002); *Lorencz v Ford Motor Co*, 439 Mich 370, 376; 483 NW2d 844 (1992). Only when ambiguity exists does the Court turn to common canons of construction for aid in construing a text's meaning. *People v Borchard-Ruhland*, 460 Mich 278, 284-285; 597 NW2d 1 (1999); *People v Stone Transport, Inc*, 241 Mich App 49, 50-51; 613 NW2d 737 (2000). Finally, in the absence of a statutory or contractual definition, the Court "may turn to dictionaries in common usage for guidance." *In re Detmer/Beaudry*, ___ Mich App ___; ___ NW2d ___ (Docket No. 336348); slip op at 6.

### B. FARM BUREAU BREACHED THE INSURANCE AGREEMENT

Farm Bureau makes two arguments on appeal. First, Farm Bureau argues that the property interest conveyed by land contract is not a complete replacement for Batton-Jajuga's fee simple in the destroyed property, and, therefore, she has failed to satisfy the precondition for any replacement-cost recovery under Subpart 5.b(4)(a) of the agreement. Second, Farm Bureau claims that, regardless of the type of property interest conveyed, Batton-Jajuga only spent $46.629.58 (the down payment and several monthly installments) when she made her claim for replacement costs, and this amount was less than the $93,000 she had already received, and

therefore she is not entitled to anything more under the replacement-cost measure of Subpart 5.b(1)(c). Both arguments fail.

### 1. BATTON-JAJUGA ACQUIRED A "COMPLETE" REPLACEMENT

Michigan law expressly permits an insurer to offer replacement-cost coverage for property damaged by fire. Specifically, under MCL 500.2826, an insurer may "reimburse and indemnify the insured" for the amount above the property's actual cash value that is "actually expended to repair, rebuild, or replace" the damaged property, not to exceed the coverage cap. The statute further states, "A fire policy issued pursuant to this section may provide that there shall be no liability by the insurer to pay the amount specified in the policy unless the property damaged is actually repaired, rebuilt, or replaced at the same or another site."

Pursuant to state law, Farm Bureau offered replacement-cost coverage in Michigan in a form consistent with coverage offered in other states. See, e.g., *Pierce v Farm Bureau Mut Ins Co*, 548 NW2d 551, 554 (Iowa, 1996) (construing replacement-loss coverage provision identical in all material respects to the one in this case); Johnny Parker, *Replacement Cost Coverage: A Legal Primer*, 34 Wake Forest L Rev 295, 301-302 (1999) (analyzing a form provision of replacement-cost coverage that is identical in all material respects to the one in this case). Batton-Jajuga purchased replacement-cost coverage from Farm Bureau, and payment of replacement cost was subject to the condition that "actual repair or replacement" be "complete." Neither the statute nor the agreement defined the terms "replace," "replacement," "actual," or "complete," and a review of the statute and agreement provides little contextual insight into the meaning of the terms.

Given this, we turn to a dictionary in common usage, here the *Oxford English Dictionary* (2d). "Replace" is defined in relevant terms as: "To restore to a previous place or position" or "To take the place of, become a substitute for (a person or thing)." "Replacement" is defined as "Something which or someone who replaces another." "Actual" is defined as "Existing in act or fact; really acted or acting; carried out; real; — opposed to *potential*, *possible*, *virtual*, *theoretical*, *ideal*." And "complete" is defined as "Having all of its parts or members; . . . embracing all the requisite items, details, topics, etc.; entire, full" and "Of an action, state or quality: Realized in its full extent; entire, thorough." With these dictionary definitions in hand, the replacement-cost condition can be understood to mean: *In fact, as opposed to potentially or possibly, the insured has acquired a full, entire substitute for the damaged property.*

Farm Bureau does not dispute that, in terms of any physical or geographical attribute, the Pinckney property is a full, entire substitute—i.e., a complete replacement—for the damaged Monroe property. Indeed, MCL 500.2827 expressly contemplates that replacement can be made at a location different from that of the insured property. Rather, Farm Bureau argues that the Pinckney property is not a complete replacement because Batton-Jajuga did not obtain a fee simple in the property upon sale, but instead only received equitable title under the land contract. Batton-Jajuga had a fee simple in the Monroe property, but with the Pinckney property, she acquired only equitable title in fee, with legal title remaining with the vendor until the balance is paid. In Farm Bureau's view, ownership under a land contract is a lesser form of ownership, something akin to a lease-with-an-option-to-buy arrangement.

If the relevant question was whether an equitable title is identical in all material respects to a fee simple, then Farm Bureau's position would be unassailable. This is not, however, the relevant question, as it would conflate the term actually used in the contractual provision—*complete*—with a different term not used in the provision—*identical*. Instead, we must consider whether Batton-Jajuga's acquisition of the Pinckney property is a full, entire—i.e., *complete*—substitute for her destroyed Monroe property. And on that question, Batton-Jajuga is on much firmer ground.

As noted, there is no dispute that the Pinckney property is physically and geographically a complete replacement. As to the legal interests in the Pinckney property, as our Supreme Court has explained, upon signing the land contract, "the vendee has, in a real sense, purchased the relevant property." *Graves v Am Acceptance Mortg Corp*, 469 Mich 608, 616; 677 NW2d 829 (2004). More specifically, the vendee acquires " 'seisin' and a present interest in the property that may be sold, devised, or encumbered." *Id.* The vendee has obtained, in other words, full equitable title to the property, while legal title remains with the vendor until satisfaction of the conditions of the land contract. As the Supreme Court expressly cautioned in *Graves*, "That the vendee may ultimately default on the contract does not negate the fact that the vendee has, in a real sense, purchased the relevant property." *Id.* Thus, under Michigan law, Batton-Jajuga is the owner of the Pinckney property, holding equitable title to it, while the vendor holds legal title in trust for her until the conditions of the land contract are fulfilled. *Id.*; *Charter Twp of Pittsfield v City of Saline*, 103 Mich App 99, 103; 302 NW2d 608 (1981).

The argument advanced here by Farm Bureau was earlier analyzed by the Supreme Court of Iowa in *Pierce*. In that case involving a sister Farm Bureau entity, the parties had entered into an insurance agreement with a replacement-cost coverage provision materially indistinguishable from the one here. The insured had purchased replacement property under a land contract, but the insurer refused to pay, claiming that the land contract had not been executed in time. Before determining whether the timing was even relevant, the Iowa court examined whether the legal interests obtained by the insured constituted a "bona fide replacement" under the insurance agreement. Or, as it framed the question, "[D]id the [insureds] fully or entirely supplant their damaged dwelling with a substitute or equivalent dwelling when they executed the real estate contract with the [vendors]?" *Pierce*, 548 NW2d at 555.

The answer was *yes*, according to the Iowa court. It recognized that, under the common law, "when the vendee contracts to buy and the vendor to sell, though legal title has not yet passed, in equity the vendee becomes the owner of the land, [and] the vendor of the purchase money." *Id.* (citation and quotation marks omitted). The court concluded that "such contracts satisfy the 'actual and complete' replacement requirement of the replacement cost provision." *Id.* at 556. The court further noted that the Farm Bureau entity in that case had "no quarrel" with this legal conclusion. *Id.*

On the question of whether replacement was complete, Farm Bureau in the present case does not distinguish *Pierce* other than to point out that it is not binding on Michigan courts and that its sister company essentially agreed with the Iowa court. Based on the latter point, Farm Bureau asserts that the Iowa court "engaged in no discussion or analysis of the issue." This assertion is belied by a plain reading of the court's decision, not least of which is the fact that the analysis takes up several single-spaced pages in the reporter. Although we agree with Farm

-5-

Bureau that *Pierce* is not binding, we do find the Iowa court's analysis to be thoughtful and in-line with relevant Michigan law.

Moreover, although we do not find the pertinent language ambiguous, even if we did,[1] we note that Farm Bureau drafted the agreement and any ambiguity must be read in favor of Batton-Jajuga as the non-drafter. *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 62; 664 NW2d 776 (2003). The replacement-cost coverage provision is boilerplate language. Nowhere in the agreement did Farm Bureau discuss fee simple, equitable title, legal title, seisin, bundles of property interests, or the like. It did, though, broadly contrast "owner" with "tenant" in another provision of the agreement, confirming that Farm Bureau could distinguish between different types of interests in property when it deemed the matter of sufficient import.

Nor is this a novel legal issue, one that could not be reasonably anticipated by the drafter. The *Pierce* decision was issued in 1996 and involved a sister Farm Bureau company, and the Michigan Supreme Court's decision in *Graves* was issued in 2004. And as for the interests impacted by the sale of real property by land contract, as well as the distinction between legal and equitable titles more generally, it is fair to say that these topics have been the bane of first-year law students for decades. Thus, had Farm Bureau intended that, for a replacement to be complete under its insurance agreement, the insured must obtain both equitable and legal titles at the time of purchase, the insurer could have explicitly said so—and that it did not must be given effect.

Accordingly, informed by *Pierce* and following *Graves* and other Michigan precedent, we conclude that Batton-Jajuga made a complete replacement of her destroyed property when she acquired the Pinckney property by land contract. The land contract was binding and unconditional upon execution, as opposed to a mere option to buy upon the satisfaction of a future condition. Batton-Jajuga gave real consideration to the vendor, both in the form of a $40,000 down payment and an unconditional promise to pay the remaining balance in future monthly installments. Under state law, she obtained equitable title to the property and, thus, she may sell, devise, or encumber the property as she sees fit. She did, "in a real sense, purchase[]" the Pinckney property, *Graves*, 469 Mich at 616, and thus she made a complete replacement under the parties' agreement.

2.  BATTON-JAJUGA "ACTUALLY SPENT" THE PURCHASE MONEY BEFORE MAKING A CLAIM FOR REPLACEMENT COSTS

Farm Bureau also argues on appeal that, regardless of whether or not the Pinckney property was a complete replacement, Batton-Jajuga had "actually spent" only $46,629.58 at the

---

[1] The construction of an ambiguous contract is generally a question of fact reserved for the fact-finder. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 469; 663 NW2d 447 (2003). Because we do not find the contractual provision ambiguous, we need not remand to the trial court. Moreover, the contract language is drawn from and mirrors the statutory language, and construction of a statute is a question of law. *Mayor of Cadillac v Blackburn*, 306 Mich App 512, 516; 857 NW2d 529 (2014).

time she made her claim, which was less than the amount that Farm Bureau had already paid to her as the actual cash value of the destroyed property. In support, Farm Bureau points to Part 5.b(1) of the agreement, which limits any replacement-cost payment to the *lesser* of (a) the agreement's overall coverage cap ($289,000); (b) the replacement-cost value of the loss ($179,811.23); or (c) "the necessary amount actually spent to repair or replace the damaged building." Under Farm Bureau's reading of Subpart (c), to be entitled to receive any payment for replacement costs, Batton-Jajuga would have had to have paid out-of-pocket something more than the actual cash value payment she had already received. In essence, according to Farm Bureau, Batton-Jajuga had no compensable replacement costs because her out-of-pocket payment for the Pinckney property was less than what she received as the actual cash value of her destroyed Monroe property. Batton-Jajuga responds that she actually spent $200,000 before she submitted her claim, as that amount was the agreed-upon purchase price for the replacement property.

Under Michigan law, the sale of real property under a land contract "operates as an equitable conversion." *Charter Twp of Pittsfield*, 103 Mich App at 103 (citation and block notation omitted). Under the doctrine of equitable conversion, equity treats the sale as actually taking place when the land contract becomes effective. This view "is based on the maxim that 'equity regards and treats as done what, in good conscience, ought to be done.' " *Id*. (citation and block notation omitted). "Accordingly, in equity a contract for the sale of land is treated, for most purposes, precisely as if it had been specifically performed." *Id.* (citation and block notation omitted); see also *Michigan Trust Co v Baker*, 226 Mich 72, 77; 196 NW2d 976 (1924) ("Whether this has been accomplished in fact or not is of no moment for, if not done, it is to be done, and the doctrine of equitable conversion governs and considers it as actually performed."); *Wood v Donahue*, 136 Ohio App 3d 336, 339; 736 NE2d 556, 558 (Ohio, 1999) (holding that, in the context of a land contract sale, "the seller, in equity, becomes the owner of the purchase money, and the purchaser becomes the owner of the property").

In its reply brief, Farm Bureau suggests that "it is unclear whether equitable conversion has survived the passage of the land contract mortgage act, MCL 565.356, *et seq.*" Other than briefly alluding to the issue, Farm Bureau has failed to develop it with any rigor and therefore has waived it. *Bruley v City of Birmingham*, 259 Mich App 619, 631 n 28; 675 NW2d 910 (2003). In any event, under article III § 7 of the Constitution of 1963, common-law doctrines remain in force until they are "changed, amended or repealed" by statute. This Court does not lightly infer that our Legislature intended to abrogate or modify the common law. Rather, this Court presumes that the common law remains intact, even when the Legislature enacts a statute on the same or a similar subject. See *Butler v City of Grand Rapids*, 273 Mich 674, 679; 263 NW 767 (1935). Having reviewed the act, we find no clear indication that the Legislature intended to abrogate or modify the doctrine of equitable conversion as applied to land contracts.

Therefore, when the land contract became effective, Batton-Jajuga became the equitable owner of the Pinckney property, and the vendor became the equitable owner of the purchase money, $200,000. Under the doctrine of equitable conversion, because the land contract was unconditional and effective, Batton-Jajuga had "actually spent" the $200,000 in purchase money before she made her claim with Farm Bureau. This amount exceeded the replacement-cost value of the loss ($179,811.23), and, thus, Batton-Jajuga was entitled to the lesser replacement-cost value minus the actual-cash-value payment she had already received (i.e., $179,811.23 – $94,000

(actual cash value) − $1,000 (deductible) − $1,085.33 (non-recoverable depreciation) = $83,725.90).

## III. CONCLUSION

When a vendee purchases property under a land contract, the vendee becomes, in a real sense, the owner of that property. While the vendee may not immediately acquire full title in the property, the vendee does acquire equitable title and the remaining legal title is simply held in trust by the vendor. Under the parties' replacement-cost coverage, which required that the insured obtain a complete replacement for the destroyed property, Batton-Jajuga satisfied the requirement when she became the owner of real property under a land contract. Moreover, in equity, she had actually spent the purchase money when the land contract became effective. Accordingly, there is no genuine issue of material fact that Farm Bureau is liable for the unpaid replacement costs as well as applicable statutory fees and interest.

Affirmed. As the prevailing party, plaintiff may tax costs under MCR 7.219.


/s/ Brock A. Swartzle
/s/ William B. Murphy
/s/ Michael J. Kelly