Lester **STECKELBERG** and Norma Steckelberg, Appellees,

v.

Howard **RANDOLPH** and Rolling Ridges Ranch, Inc., Appellants,

Darrell Slayton, Ernest Carstens, Douglas Carstens, James Carstens, and Gerald Carstens, Individually and d/b/a Carstens & Sons Farms, Defendants.

Nos. 84–1432, 84–2001.

Supreme Court of Iowa.

April 15, 1987.

Rehearing Denied May 11, 1987.

Robert Kohorst of Kohorst Law Firm, Harlan, for appellants.

Tobin Swanson and Emil Trott, Jr., of Barrett & Trott, Des Moines, for appellees.

Considered by HARRIS, P.J., and SCHULTZ, CARTER, WOLLE, and LAVORATO, JJ.

HARRIS, Justice.

Plaintiffs, Lester and Norma Steckelberg, a debt-stricken farm couple, contract-

ed with defendant Randolph for the transfer to him of their farm, farm operation, and related assets. Under the plan Randolph was to assume control over the property, take charge of the operation, and infuse it with his own capital, all with the goal of successfully conducting the farm and operation through desperate economic times. It was agreed that when the goal was reached and the debts repaid the farm would be reconveyed to the Steckelbergs. Sometime after the arrangement was in place the Steckelbergs brought this suit. Equitable and legal theories were separated for trial but have been again consolidated on this appeal. On the equity claim the trial court held that the deed of the farm amounted to an equitable mortgage. On a jury trial of the legal issues arising from fraud, the trial court directed a verdict, dismissing the claims at the close of all evidence, but set that ruling aside on a posttrial motion and ordered a new trial. We affirm.

The Steckelbergs have owned a 385 acre farm in Guthrie County since 1958. In the written agreement they made December 17, 1980, with defendant Howard Randolph[1] they acknowledged being in debt "to numerous creditors" and facing various lawsuits, some of which had already been reduced to judgment. The agreement stated the Steckelbergs "wish to employ Howard Randolph ... for the purpose of settling matters with ... creditors and preserving as much of the Steckelbergs' property as may be reasonably possible."

In consideration of Randolph's services, the Steckelbergs conveyed or assigned the farm and an interest in other real estate installment contracts, buildings, equipment, and other assets they owned. According to the agreement the parties' intent was "to place property of the Steckelbergs at the disposal of [Randolph] for the purpose of compromising and settling the indebtedness of the Steckelbergs and obtaining redress for [them] in those matters where it may be reasonably done."

Paragraph four of the agreement authorized Randolph to settle and compromise the Steckelbergs' debts, but stated that Randolph (and his corporation) were not to receive a fee or salary for services performed. Instead Randolph would be "entitled to compensation for all reasonable expenses ... for any and all sums paid to compromise said debts," with a lien against the Steckelbergs' property for any unsatisfied expenditures. The agreement was terminable by the Steckelbergs at any time or by Randolph on sixty days notice, "at which time all sums owed ... would be due in full." Upon termination by either party, the agreement provided, the Steckelbergs would be entitled to "reconveyance" of the property upon repayment of all sums owed to Randolph.

A warranty deed to the farm, along with an assignment of a real estate contract to Randolph, and a power of attorney were executed at the same time, on December 17, 1980. The power of attorney authorized Randolph to sell, convey, or lease any of the Steckelbergs' property.

On January 13, 1981, Randolph and the Steckelbergs entered a "joint venture agreement," creating an entity known as "C & R Feed Lots." According to the joint venture agreement Randolph would contribute the use of the Steckelbergs' real estate in the venture, as well as $20,000 in capital. Randolph also agreed to furnish the financial management of the joint venture, reserving the sole authority to keep records, incur debts, make sales, and purchase items on behalf of the venture. The Steckelbergs agreed to furnish labor as independent contractors, as well as the machinery and livestock for C & R Feed Lots, retaining control over the daily activities and operations. The surplus profits of C & R Feed Lots were to be applied by Randolph to the Steckelbergs' debts and obligations.

A farm lease providing for cash or crop shares was executed as a companion doc-

1. Randolph owns and functions through a private corporation called Rolling Ridges Ranch, Inc. The corporation was also a party with Randolph to the contract and is a defendant with him in this suit. For simplicity we however refer to Randolph and his corporation singularly as Randolph.

ument to the January 13, 1981, joint venture agreement. The land described in the farm lease included all of the land conveyed by the Steckelbergs to Randolph in December 1980. The joint venture agreement stated that the Steckelbergs were to be "partners in C & R Feed Lots." They were not so treated however. Instead they were treated as employees and paid $500 per month for their services. In 1982 Randolph issued the Steckelbergs a W–2 form for their services.

On June 5, 1981, another joint venture was undertaken. Parties to this agreement included the Steckelbergs, Randolph, and Darrell E. Slayton. According to this agreement the parties would form an enterprise, also known as "C & R Feed Lots," supplanting the prior joint venture on June 30, 1981. Randolph was to contribute the Steckelbergs' Guthrie County real estate to this enterprise, as well as "certain real estate leased to Slayton and which Slayton has by agreement and power of attorney given full authority to [Randolph] to operate." In addition Randolph agreed to contribute $20,000 in capital, as well as certain farm equipment and livestock obtained from Slayton and the Steckelbergs. In all other respects, including the distribution of the venture's profits for payment of Steckelbergs' (and Slayton's) debts, the June 5, 1981, joint venture agreement was the same as the earlier one.

The Steckelbergs and Randolph continued in the contractual relationship set up by the June 5, 1981, agreement until the summer of 1982. By July 1982 the Steckelbergs wanted to extricate themselves from the agreement. Surprised when they received the W–2 forms identifying them as wage earners of the venture, rather than partners, they unsuccessfully sought copies of the tax returns of the enterprise. They were also rebuffed in their request for a payoff figure.

Randolph's response was to demand that the Steckelbergs sign a release of their right to obtain a reconveyance of their farm. Randolph took the position that, "due to waste and mismanagement ... by the Steckelbergs in the hog raising opera-

tion," the enterprise could not be made profitable. When the Steckelbergs refused to sign the release Randolph served notice on August 3, 1982, that the December 17, 1980, agreement, was terminated. The notice demanded payment within sixty days of all sums owing Randolph by the Steckelbergs, which he calculated to be in excess of $725,000.

On August 20, 1982, Randolph, for himself, his corporation, and C & R Feed Lots, leased the Steckelberg farm to defendants Carstens who operate a partnership called Carstens & Sons Farms. The cash rent was set at $250 monthly from September to December 1982 and $1250 monthly through December 1985. The Steckelbergs were not a party to this lease and had no knowledge of it.

The Carstens were also given an alternative role. On August 20, the same day the lease was signed, Randolph signed a contract with them by which the Carstens purchased the Steckelbergs' farm for $400,000, one dollar down with a balance due and payable August 24, 1992. Interest was set at eleven percent per annum, to be paid annually. It was never paid. The contract stated it would take effect only if the Steckelbergs failed to pay their outstanding debts.

This was not all. Also on August 20 Randolph sold Carstens the Steckelbergs' farm machinery, growing crops, hogs, corn, and feed. These items had previously been transferred by the Steckelbergs to C & R Feeds. The Carstens paid $270,000 for these items, depositing a down payment of $70,000 and signing two notes in the amount of $100,000 each. The Steckelbergs were also unaware of this sale. Knowledge came October 23, 1982, in a letter from Randolph. It said:

> Now that a complete sale [has been made] of all of the assets of C & R Feed Lots and of the assets of [Randolph and his corporation] used in the operation of C & R Feed Lots, I could put together a figure that would be required for you to pay off your indebtedness to me ... for what we have expended on your behalf since December 17, 1980.

The Steckelbergs filed this action, alleging fraudulent misrepresentation against Randolph, seeking a declaratory judgment, quiet title to the farm, an accounting and monetary relief. The defendants[2] answered and also brought a forcible entry and detainer action against the Steckelbergs. On pretrial motions the district court appointed a special master to perform the requested accounting, ordered bifurcation of plaintiffs' legal and equitable claims for trial, and stayed the defendants' forcible entry and detainer action against the Steckelbergs until final disposition of the suit.

Upon trial of the equitable issues the trial court substantially adopted the recommendations of the special master and then determined that the Steckelbergs owed Randolph $380,000. The trial court held the defendants liable for all indebtedness, liens, and real estate taxes due on the Steckelberg farm and nullified all other agreements between the parties, including the lease and sales contracts to the Carstens. The trial court quieted title in the Steckelbergs to all real estate previously owned by them and sold to Randolph, subject only to an "equitable mortgage" of $380,000[3] and a farm lease to the Carstens. The court's order provided that the farm lease to the Carstens would become "null and void" on December 31, 1984.

The trial court dismissed the defendants' forcible entry and detainer action against the Steckelbergs and ordered all parties to pay their own attorney fees. Randolph was given the right to foreclose his "equitable mortgage" after December 31, 1984, in the event the $380,000 was not repaid.

The legal counts of the Steckelbergs' petition were brought on for trial before the trial court and a jury. At the close of evidence the trial court directed a defendants' verdict and dismissed the Steckelbergs' allegations of fraud. The Steckelbergs' posttrial motion for new trial on the fraudulent misrepresentation claim was granted by the trial court. Randolph's appeal followed.

I. The first question is whether the trial court correctly found that the deed of the farm from the Steckelbergs to Randolph amounted only to an equitable mortgage. Randolph contends the deed was an absolute conveyance of title, not merely the giving of a security interest.

We have always recognized that "[a] conveyance absolute on its face may, by proper evidence, be shown to be but a mortgage. . . ." *Trucks v. Lindsey*, 18 Iowa 504, 504 (1865). In order for a warranty deed or quitclaim deed to be converted into an equitable mortgage or security agreement, the party asserting the conversion must prove:

(1) That the consideration for the warranty deed was an existing indebtedness, together with the amount of such indebtedness; and (2) that such indebtedness was not extinguished by the conveyance, but was kept alive.

*Clark v. Chapman*, 213 Iowa 737, 743, 239 N.W. 797, 800 (1931). The requirement of an antecedent debt may also be satisfied by an assumption of liability or a contract for future advances contemporaneously made. 59 C.J.S. *Mortgages* § 37, at 73–74 (1949). *See also Lovlie v. Plumb*, 250 N.W.2d 56, 59 (Iowa 1977) (transfer of title absolute on its face, if intended as a security alone, will be deemed a mortgage); *Reusch v. Shafer*, 241 Iowa 536, 547, 41 N.W.2d 651, 657–58 (1950) (instruments are presumed to be what they purport to be; but, upon clear, satisfactory, and convincing evidence, an instrument labeled a "deed" may be construed as an "equitable mortgage"). If, however, a deed is to be construed as a security instrument, "the supportive evidence must be clear, satisfactory, and convincing." *Lovlie*, 250 N.W.2d at 59 (citing *North v. Manning Trust & Savings Bank*,

---

**2.** Slayton and the Carstens were also defendants along with Randolph. They filed no briefs and did not participate in the appeal.

**3.** The trial court found that the Steckelbergs owed Randolph $650,000 before Randolph's un-

authorized sale of the Steckelberg farm to the Carstens in 1982; and, that crediting the Steckelbergs $270,000 for the sale of the personal property to the Carstens, the net amount due was $380,000.

169 N.W.2d 780, 784 (Iowa 1969)); Rendleman, *Absolute Conveyance as a Mortgage in Iowa,* 18 Drake L. Rev. 197 (1969); Note, *Equitable Mortgages in Iowa,* 44 Iowa L. Rev. 716 (1959). In determining the intent of the parties, parol evidence may be considered and the courts may "look behind the form of an instrument to ascertain the actual relationship between [the] participants." *Lovlie,* 250 N.W.2d at 59; *see also Collins v. Isaacson,* 261 Iowa 1236, 1243, 158 N.W.2d 14, 20 (1968); Note, *Equitable Mortgages in Iowa,* 44 Iowa L. Rev. 716, 717–21 (1959).

■ If it is unclear whether a mortgage or absolute deed was intended, we resolve the doubt in favor of an equitable mortgage. *Greene v. Bride & Son Construction Co.,* 252 Iowa 220, 226–27, 106 N.W.2d 603, 607 (1960); *Fort v. Colby,* 165 Iowa 95, 102, 141 N.W. 393, 395 (1913). A telltale sign that a deed, absolute on its face, amounts only to an equitable mortgage appears where the transaction of which it is a part operates to create or continue as between the parties the relation of obligor and obligee. 55 Am.Jur.2d *Mortgages* § 33, at 215–16 (1971).

Our reluctance to recognize as an "absolute conveyance" an agreement between the parties which continues or creates an obligor-obligee relationship was pointed out in *Koch v. Wasson,* 161 N.W.2d 173, 177 (Iowa 1968) (citing *Guttenfelder v. Iebsen,* 230 Iowa 1080, 1084, 300 N.W. 299, 301 (1941)).

Retention of possession of the transferred property by the grantor is considered yet another circumstance inconsistent with the theory of absolute conveyance. *Koch,* 161 N.W.2d at 178. And the execution and delivery of an option to repurchase, the unavailability of legal advice for the grantor, and financial hardship as an inducement to the grantor in entering the agreement, all constitute "classic circumstances pointing to a debtor-creditor relationship." *Id.; see also Greene,* 252 Iowa at 224, 106 N.W.2d at 607 (in determining whether a conveyance is a deed or a mortgage, important elements include whether the grantor is at a point where financial help is urgently needed, and whether adequate consideration was paid for the grantor's property).

■ The challenged ruling was clearly correct and seems inescapable. Indeed, no routine ingredient for an equitable mortgage is missing. The evidence supporting the holding easily qualifies as clear, satisfactory, and convincing. All facts making up the transaction are archetypical of an equitable mortgage.

The Steckelbergs were in desperate financial straits when they became obligated to Randolph. As a result they conveyed their farm to him, executing a contract which provided for reconveyance of the farm when the obligation was repaid. At all material times the Steckelbergs remained on the farm.

Moreover the transaction, if not a mortgage, would be grossly unfair to the Steckelbergs. In consideration of their conveyance of their farm, Randolph offered no more than to help them in settling and compromising outstanding debts. Any money he invested was to be repaid. The Steckelbergs entered the transaction at Randolph's urging and suggestion, without the assistance of independent legal advice or counsel. Although there was no antecedent debt between the parties prior to the transaction, it is clear the agreement itself contemplated future advances by Randolph, which created a debtor-creditor relationship.

Finally, the contract itself clearly described an intent to create a mortgage and not to pass title to the farm. Paragraph twelve of the agreement unequivocally gave the Steckelbergs the power to terminate the agreement, revoke the power of attorney and other documents, and to demand a reconveyance upon repayment of any amounts due Randolph. The agreement stated it was to "place the property of the Steckelbergs at the disposal of Randolph," for the limited purpose of "compromising and settling the indebtedness of the Steckelbergs."

We reject Randolph's challenge to the trial court's finding of an equitable mortgage.

II. The trial court quieted title to the farm in the Steckelbergs, nullifying the lease and real estate contracts between Randolph and the Carstens. On appeal Randolph challenges this holding, relying on the "presumption in favor of the legality of contracts," on the power of attorney, and on provisions in the December 1980 agreement.

Having correctly found an equitable mortgage the trial court enjoyed broad discretion in fashioning an appropriate remedy. *Holden v. Construction Machinery Co.*, 202 N.W.2d 348, 363–64 (Iowa 1972) (equity court may mold its decree to fit circumstances). *See* 30A C.J.S. *Equity* § 599, at 666 (1965).

There was no abuse in the holding.

III. Randolph strenuously challenges the trial court holding which set the Steckelbergs' indebtedness at $380,000. He claims the holding impermissibly rewrites the parties' agreement and "unjustly enriches" the Steckelbergs by requiring him to pay debts, liens and taxes which he had no part in incurring. Randolph contends he should be paid $929,572.33, a figure derived from his claimed expenditures for the farm, with interest, less income.

The trial court was impressed, as we are, by the views of two certified public accountants who extensively investigated the many transactions involved. One, Harlan L. Gronewold, was the special master whose report has been mentioned. The Steckelbergs also called Dennis Mueller, another certified public accountant, as their own witness. Mueller's conclusions were of crucial importance to the trial court's determination regarding the disputed items in the accounting and were therefore decisive in the determination that $380,000 was the amount due.

Regarding the disputed items the trial court held:

> Because Howard Randolph had complete control of all funds, made all decisions, received all the income and paid all the expenses, personally did all of the accounting, and intermingled the plaintiffs' funds with others he should bear the burden of proving the discrepancies as

shown in ... the Master's Report. Also, after listening to the parties testify, in viewing their demeanor on the witness stand, the Court finds that many of the disputed items should be decided in favor of the plaintiffs.

The trial court noted just how Mueller's testimony bore in this determination:

> Sometime prior to testifying [Mueller] examined the books and records concerning this matter and found that it is difficult, if not impossible, to determine an exact amount due. Howard Randolph because of the mingling of funds. By his own admission Howard Randolph did not know the exact amount due as evidenced by the fact that he offered the return of the farm to the plaintiffs for the sums of $600,000.00, $675,000.00, and $725,000.00 within one month.

Mueller concluded that the amount the Steckelbergs owed Randolph was $650,000, less the value of the Steckelberg equipment, livestock, and crops, which were sold to Carstens. He thought the $270,000 figure for those items, though it could well have been $75,000 higher, was fair. He thought the lease of the farm to the Carstens was low by $25,000. He concluded that Randolph favored the Carstens to the Steckelbergs' detriment, specifically noting Randolph and the Carstens were represented by the same attorney.

The trial court accepted the $270,000 figure and reached the net amount due by subtracting it from the $650,000 it determined to be the gross amount due to Randolph. We reach the same determination with regard to the figures.

Randolph contends he should not be charged with $100,000 of the $270,000 adjustment ordered by the trial court which was reflected in a separate note executed by the Carstens. That note made the obligation dependent on the sale of the Steckelbergs' farm, a sale which stands to be voided by our finding of an equitable mortgage. We agree with the trial court's rejection of this contention. With the transfer of $270,000 in property to the Carstens, it is *no* answer to the Steckelbergs that the

consideration received from the Carstens is in jeopardy.

Although he vigorously disputes the figures, Randolph does not otherwise challenge the trial court's $270,000 adjustment. We agree with the $650,000 gross amount of indebtedness and with the $270,000 valuation for the property sold to the Carstens. We also agree that the Steckelbergs are entitled to a credit for that sale. Randolph's challenge to the adjustment is without merit.

To whatever extent the figures have become obscure we emphatically agree with the trial court that Randolph suffers from a self-inflicted wound. His commingling of the funds makes it virtually impossible, as the certified public accountants noted, to trace the transactions with precision.

IV. There remains only Randolph's challenge to the trial court's grant of a new trial in the law action. He complains especially because the ruling reflects a change of position by the trial court, which had originally directed a verdict in his favor. But a change of view on such a question is in no way unique. Neither is it a ground for restricting a trial court's discretion in such matters.

District courts in Iowa have broad discretion in ruling upon motions for new trials. *See* Iowa R.App.P. 14(f)(3) ("In ruling upon motions for new trial the trial court has a broad but not unlimited discretion in determining whether the verdict effectuates substantial justice between the parties."). When a court erroneously directs a verdict, it may properly grant a new trial. *Williams v. Kearney*, 224 Iowa 1006, 1008–11, 278 N.W. 180, 181–82 (1938).

When the trial court sustained the motion for a directed verdict, it was persuaded that damages were not proved. Upon reconsideration of the evidence it concluded the jury could have believed all four damage elements, explained in *Beeck v. Aquaslide 'N' Dive Corp.*, 350 N.W.2d 149, 155

(Iowa 1984), had been established. We agree. There was no abuse in the ruling.

AFFIRMED.