# IN THE COURT OF APPEALS OF IOWA

No. 14-1600
Filed October 28, 2015

JOHN THOMA, KELLY THOMA,
ERNEST W. THOMA, ALICE M.
THOMA and JKT FARMS, LLC,
    Plaintiffs-Appellants/Cross-Appellees,

vs.

JAMES B. GANSEN, MARY
GANSEN and DUPACO
COMMUNITY CREDIT UNION,
    Defendants-Appellees.

and

JAMES B. GANSEN and MARY
GANSEN,
    Cross-Appellants.
_____

JAMES B. GANSEN and MARY
GANSEN,
    Plaintiffs,

vs.

JOHN THOMA and KELLY THOMA,
    Defendants.
_____

Appeal from the Iowa District Court for Jackson County, Stuart P.

Werling, Judge.

The Thoma family appeals and the Gansens cross-appeal the

district court's conclusion an equitable mortgage was not created by the

parties' warranty-deed transaction. **AFFIRMED.**

Peter C. Riley of Tom Riley Law Firm, P.L.C., Cedar Rapids, for appellants.

Todd J. Locher of Locher & Locher, P.L.C., Farley, and Chad Leitch of O'Connor & Thomas, P.C., Dubuque, for appellees.

Heard by Danilson, C.J., and Vogel and Tabor, JJ.

**Tabor, Judge.**

This case involves the doctrine of equitable mortgage. A farm family facing foreclosure contends the eleventh-hour purchase of their property did not result in an absolute conveyance of the title. We find the circumstances surrounding the transactions between the Thoma family and the Gansens show the parties intended a sale of the farms and affirm the district court.

## I. Background Facts and Proceedings

Ernest and Alice Thoma (jointly "Ernest and Alice") are the parents of John Thoma, who is married to Kelly Thoma (jointly "John and Kelly"). Besides the dairy farm on which Ernest and Alice reside, they also owned the 200-acre Herrig farm. In the 1990s, John and Kelly financed their purchase of the 250-acre Thoma farm with Dubuque Bank and Trust. John and Kelly lived on the Thoma farm, which borders the Herrig farm. Subsequently, Dubuque Bank foreclosed, and a third party bought the Thoma farm at a sheriff's sale.

In 2007 Ernest and Alice borrowed approximately $600,000 from American Trust and Savings Bank to redeem the Thoma farm from the third party. Ernest and Alice obtained title to the Thoma farm. On May 18, 2007, Ernest and Alice entered into a "lease-to-purchase" contract with John and Kelly for the Thoma farm. Kelly testified their lease payment equaled and was derived from Ernest and Alice's mortgage payment to American Trust. Thereafter, Ernest and Alice refinanced the American Trust debt with Farm Credit Services of America (FCSA), pledging as collateral both the Thoma farm and the Herrig farm. The record supports the district court's finding:

The refinancing was for $950,000. No explanation for the increase in the debt load associated with these lands was given at trial . . . . It is clear . . . Ernest and Alice took the steps they took in order to preserve the two parcels so they could later [be] acquired by John and Kelly.

In approximately 2012, Kelly and John started cash renting the Herrig farm from John's parents. Alice's testimony that John and Kelly never paid "anything after" the FCSA refinancing is supported by Ernest and Alice's 2012 tax return. Ernest and Alice did not pay FCSA, and in June 2012 FCSA filed a foreclosure action.

During the pendency of the foreclosure action, the Thoma couples entered into an "offer to buy and acceptance" sales contract on November 21, 2012, in which Ernest and Alice agreed to sell both farms (Thoma and Herrig) to John and Kelly for $1 million.[1] Ernest and Alice's attorney, Nathan Runde, held $100 in trust as earnest money. Possession and closing were set "on or before January 1st, 2013," at which time Ernest and Alice would deliver a warranty deed to John and Kelly. John and Kelly did not obtain the financing by January 1. Kelly testified one of their children has life-threatening medical issues and medical bills ruined their credit. After the closing date, Kelly continued to seek financing and believed the funds would come from a non-bank lender she found on the internet, American Capital Holdings, LLC. On January 16, 2013, Kelly retained attorney Flint Drake, who testified the original purpose of his representation "was to review

---

[1] Paragraph 23 provided: "This agreement rescinds any previous Offers to Buy the parties may have entered into and renders them void." John and Kelly's brief claimed, based on their 2007 contract, they had an equitable interest in the entire 450 acres. But during oral argument, John and Kelly's attorney admitted the 2012 sales contract superseded the 2007 contract. This acknowledgement is consistent with attorney Flint Drake's testimony stating he viewed the 2012 contract as "superseding or replacing" the 2007 contract.

loan documents to basically effectuate a purchase from Ernest and Alice by John and Kelly for $1 million."[2]  When Kelly hired Drake, she did not tell him about the foreclosure proceedings.

On January 25, 2013, a special execution issued setting FCSA's sheriff's sale for March 19, 2013.  Drake, still unaware of the sheriff's sale, made numerous unsuccessful attempts to discuss the loan with Andrew Smithson at American Capital and started doubting the legitimacy of the company.[3]  On March 6, 2013, Drake received "unusual" loan documents from American Capital for a "completely unsecured loan" at "three percent amortized over twenty years." Believing the proposal "was too good to be true," Drake immediately called Kelly and told her, "I've never seen a lender in the country that would do this loan" and "I'm just glad they don't have any of your money."  Kelly replied, in fact, she had given American Capital a deposit.  On March 7, Drake called American Capital and left a message stating it had failed to include the "additional operating-line loan" John and Kelly requested and John and Kelly needed a full funding commitment.  Drake testified American Capital was "always a little vague, there was never a full commitment."  It is undisputed the 2012 sales contract for $1 million never closed.

---

[2]  Kelly believed her in-laws were agreeable to a post-January 1 closing as soon as John and Kelly's financing was completed with American Capital.  Alice testified they orally modified the contract to extend the closing.  Drake believed Ernest and Alice "still desired to close" even though the January 1, 2013 deadline had passed.

[3] Drake testified he only spoke to Mr. Smithson in person once, on February 11, and this call "added to my concern about him, he was really unprofessional in the call, he was kind of belligerent."  Also, "[I]t went on for some time, not getting responses from him."

On March 12, 2013, Kelly came to Drake's office with the March 19 sheriff's-sale documents. Drake testified this new information "ratchets up the urgency, because I had no confidence in" American Capital "to come through." The record supports the district court's finding: "Neither Alice, John, nor Kelly appear willing to take responsibility for the problems incurred by their poor payment history [resulting in FCSA] commencing a foreclosure or their poor communication with their attorney or Mr. Drake in not letting him know of a looming sheriff's sale until a week prior."

Drake immediately called the attorney for FCSA and learned the farms could be redeemed "at whatever the purchase price was at the foreclosure sale." Drake conveyed this information to Kelly and also told Kelly any excess funds received over the FCSA loan debt would go to Ernest and Alice. Drake and Kelly had numerous conversations, and on March 14, five days before the sale, Drake told Kelly "the best option was to just let the sale happen. We're less than a week out from the sale, the chance of getting funding was really low, so let the sale happen and then attempt to redeem." But Kelly insisted the sheriff's sale had to be prevented so she and John could buy the farms for $1 million, rather than paying the higher price the farms were expected to bring at the sale.

Because Kelly "felt it was imperative" to stop the sheriff's sale, Drake continued to pursue financing options and called two bankers. Both told him "it sounded like a loan they could have interest in because of the value of the farm, but . . . there was no way they could do anything that quickly." Drake then told Kelly there was not enough time for the banks to make a loan. Drake knew his

client, Jim Gansen, "was an investor and owned farms." On March 15, four days before the sale, Drake called Kelly and asked if she wanted him to contact Gansen "to see if there was any way [Gansen] might be able to put something together." Drake told Kelly if Gansen was interested, then conflict issues would need to be addressed because Gansen was also Drake's client. Kelly instructed Drake to make the call. Drake called, and Gansen replied, "Let me see what I can do, and I'll get back to you." Gansen testified he was aware of the Thoma family's "somewhat rocky" financial reputation but he was "interested" if his lender was satisfied with the terms.

The next day, March 16, 2013, three days before the sale, Drake received a call from John Koppes, a lender at Dupaco Dubuque and Gansen's banker. Koppes and Drake discussed "if there was a possibility of Dupaco providing funding to Mr. Gansen in some way." Drake testified whether Gansen's involvement would be a loan or a purchase did not come up in the initial discussion. But at some point in Drake's series of phone calls with Koppes, Drake learned "Dupaco was not interested in loaning funds unless it was for a purchase [by Gansen] and [Dupaco] would have first position on the farm." Drake understood this was Dupaco's condition precedent for making a loan to the Gansens.

Koppes testified similarly, a loan to the Gansens in this time frame would be an "extraordinary event"; Koppes had told Drake "I wanted to be in first position"; and Koppes had also told Drake that Dupaco would not release the funds "until [Drake] sees that the title will be in Gansen's name." Koppes testified

he told Gansen he could borrow $666,000 with the requirement the Gansens, Jim and Mary, contribute "some down stroke" of their own money, around $300,000. Gansen testified similarly, recalling he told Drake: "There's only one way I would entertain something like this, and that is if I bought it . . . . [T]hat was the only way." Drake's testimony confirmed Gansen's testimony: "[T]hen Mr. Gansen had called and laid out that he could do it as a purchase, then I called Kelly."

Drake communicated the sale terms and conditions to Kelly and also suggested she get a new attorney. Kelly replied there was not enough time to hire another attorney and instructed Drake to proceed. Drake agreed to act under a conflict-of-interest waiver. In addition to finalizing title and drafting the offer to buy real estate and acceptance (seller—Ernest and Alice Thoma; buyer—Jim and Mary Gansen; sale price—amount of FCSA first mortgage), Drake drafted and finalized an option agreement (grantors—Jim and Mary Gansen; grantee with 60-day option to buy—newly-created JKT Farms, LLC, by John and Kelly Thoma).[4] The option price was the total of (1) the Gansens' payment to Ernest and Alice, (2) a $2500 loan-closing fee, and (3) any costs incurred by the Gansens for insurance and real estate taxes. Drake was the point person updating Kelly, Gansen, Koppes, and Runde. The record supports the district court's finding: "All this was done in an incredibly compressed time frame by attorney Drake, and pursuant to the specific direction and agreement of Ernest and Alice Thoma and John and Kelly Thoma."

---

[4] Kelly explained she created JKT Farms, LLC so that if financing was obtained to exercise the option, the corporation could buy the farms and avoid liens personal to John or Kelly.

Attorney Runde, on behalf of Ernest and Alice, asked Drake to add paragraph "22 Other Agreements" to the sale contract between Ernest and Alice and the Gansens. Drake complied, and the requested paragraph stated: (1) John and Kelly could remain in possession of the property through the May 18, 2013 option date "as long as they pay all utilities, maintenance and repairs and other costs associated" with "living thereon"; (2) John and Kelly and Ernest and Alice "agree to hold harmless and indemnify [the Gansens] from [any and all] causes of action in any way related to [John and Kelly] remaining upon the Real Estate after the date of the closing"; and (3) the Gansens release Ernest and Alice from any liability for judgment liens on the real estate ($2000). Also, John and Kelly agreed to pay Ernest and Alice "an amount equal to the difference between the amount paid by [the Gansens] hereunder and $1,000,000. For example, if the purchase price paid hereunder is $957,000, then on the date of closing under the option [John and Kelly] shall also pay to [Ernest and Alice] the sum of $43,000." Thus, Ernest and Alice's independent legal counsel arranged for them to still receive $1 million for the farms as long as John and Kelly, their son and daughter-in-law, obtained financing and exercised the option to buy the farms from the Gansens.

It is undisputed Runde "strongly advised" Ernest and Alice not to sell the farms to the Gansens, but they ignored this advice. Runde drafted the warranty deed to transfer title to the Gansens. Alice testified she and Ernest proceeded with the Gansen transaction because it "was the only way to get the deal going and get it done." This testimony shows Alice's recognition of the fact John and

Kelly did not have the financing necessary to close on their $1 million 2012 sales contract before the sheriff's sale.

On March 18, 2013, the Gansens signed the documents separately from John and Kelly. The record shows the Gansens and John and Kelly did not have any direct conversations about the transaction—all communications occurred through Drake. Also on March 18, Drake explained the "offer to buy and acceptance" and the separate option agreement to John and Kelly, who signed both documents in Drake's office. John and Kelly signed "per paragraph 22," the paragraph requiring them, upon exercising the option, to pay Ernest and Alice the difference between the Gansens' purchase price and $1 million. John and Kelly then took the "offer to buy and acceptance" to Runde's office for Ernest and Alice's signatures, and Ernest and Alice signed in Runde's office. Ernest and Alice did not sign the separate option agreement between the Gansens and JKT Farms. In the late afternoon of March 18, 2013, Dupaco wired $957,187.63 directly to FCSA to complete the closing. FCSA cancelled the sheriff's sale set for the next day.

On the following day, March 19, 2013, Drake sent a reminder letter to John and Kelly, stating in relevant part:

> 3. Option Agreement pursuant to which the Gansens grant to your limited liability company the right to purchase the farm . . . . Please note you must give notice of the exercise of the Option to Gansens in writing and we provided you could send that notice to our office. This notice must be received by May 1, 2013. If you fail to provide this notice within this time frame the option will expire. You must then close the transaction by May 18, 2013.
> We understand you will continue to work with Andrew [Smithson] to finalize financing to exercise the option. Please let us

know if we can assist in that process. We look forward to hearing from you regarding a closing date. Thank you.

It is undisputed John and Kelly had requested the sixty-day time period, March 18 to May 18, to close on the option, and they never contacted Drake to arrange a closing.

Gansen testified he requested the notice provision so he would have time to make arrangements to finance crop inputs if JKT Farms elected not to exercise the option and he needed to farm the land. Drake testified Smithson had been telling Kelly, "It won't be a problem. Sixty days, easily, we'll have it done."[5] But because of Drake's "past interaction" with Smithson, "which [he had] shared with Kelly, [Drake] was nervous about" American Capital actually providing funding. Drake therefore added the last paragraph setting out his understanding that Kelly "wanted to continue to work with" Smithson although Drake had told Kelly he could again contact the two banks he previously contacted. Drake believed because "we have sixty days, [those banks would] probably be able to put something together." Drake testified Kelly "was concerned about additional costs being incurred" if Drake pursued a bank loan, "when Mr. Smithson had [already] made a proposal, didn't have a lot of cost, and [would give] them the money they needed." Against Drake's advice, Kelly told him to refrain from contacting the banks until "she exhausted the option" with Smithson.

---

[5] Under the option agreement, JKT Farms, LLC could either hand deliver to Jim or Mary Gansen or mail to Drake's law firm its written notice of intent to purchase the farms under the option terms. The option provided the Gansens or the Drake Law Firm had to receive the notice "on or before May 1, 2013 (the period from [March 18, 2013] through May 1, 2013 shall be referred to as the 'Option Term') and the transaction must close on or before May 18, 2013 or this option shall expire and neither party shall have any further obligation hereunder."

On April 2, 2013, Drake called Kelly for an update and reminded her of "the timing issues on the option." On April 16, 2013, FCSA told Drake it had overstated the payoff amount by $37,000 "in the rush in March." Drake immediately called Kelly. Thereafter, the Thoma family refused to allow FCSA to pay the excess funds to the Gansens.[6] Also on April 16, Drake talked to Kelly about American Capital and learned she was continuing to work with Smithson who "was still saying he would have the money."

On May 6, 2013, Kelly called Drake to update him on the status of the loan from American Capital. Because Drake had not received written notice from JKT Farms, he asked Kelly "if she had sent the notice to exercise the option." According to Drake, Kelly replied she "had not at that time." Later that day, Kelly hand-delivered a written notice exercising the option, dated April 27, 2013. Drake marked it "received 5-6-13" and told Kelly, ["It is] after the first, I don't know what [the Gansens'] position will be." At trial, Kelly insisted she had not backdated the notice but had tried, unsuccessfully, to send it by e-mail to Drake before May 1, 2013. Kelly presented no e-mail documentation to substantiate her claim. Kelly admitted no such e-mail was received by Drake. The district court found Kelly presented a back-dated notice, and we find likewise.

---

[6] The Gansens requested FCSA return their overpayment of $37,000, noting their 2013 sales contract provided their purchase price equaled "that amount necessary to pay off [FCSA] first mortgage related to the Real Estate (in the approximate amount of $957,000)." Despite that language, attorney Runde told FCSA and the Gansens the overpayment should go to Ernest and Alice under "a colorable title to the excess proceeds from that transaction." The parties agreed to hold the excess funds in Drake's trust account pending a court order. At trial, Ernest and Alice presented no evidence to support their claim to the funds, and the district court ordered the funds distributed to the Gansens.

Drake forwarded the notice to the Gansens and then had a conversation with Jim Gansen, who said, "What does this mean"? Drake replied he was nervous because of the conflict-of-interest issue. Drake told Gansen, "I don't know what a court would do if they . . . tender the money now . . . . It's better if everybody would work something out." Gansen testified:

> Q. Did you ever tell Mr. Drake that because it was late that you felt the option was null and void. A. No, I did not. In fact, truth of the matter is, I was rooting for them to be able to come up with the money. And if they could have [come] up with the money, I would have entertained the payment.

In the spring of 2013, Kelly told Drake she was working with an investor in Maquoketa as well as with Smithson. Drake told Kelly, "no matter what happens" you "tender the funds by the 18th and you will be in a better position." Drake and Kelly spoke again on May 10. Kelly asked about the status of the exercise of the option, and Drake again said "we just need to proceed as if it was timely and try to get the funding." On May 13, Kelly and Drake again talked about the Smithson loan and the Maquoketa investor.

On May 14, Runde called Drake for an update; Ernest and Alice "wanted to know what was happening with the funding." Runde's phone inquiry is logical because under paragraph 22, Ernest and Alice would receive additional funds up to $1 million if John and Kelly obtained financing and exercised the option. Drake updated Runde and then called Kelly to tell her Runde had called. Drake "encouraged her to take the funds from the [Maquoketa] investor now and tender them because that would help her position." At some point Kelly told Drake the Maquoketa investor "had changed his mind or he got greedy." Drake thought "it

seemed like [the Maquoketa investor] was falling through . . . but he was still out there as a possible funding source." To Drake's knowledge the Maquoketa investor "never provided funds."[7]

Also on May 14, Drake sent a letter to the Gansens and to John and Kelly because "at some point those conflicts" are not able to be waived. "I felt by this point on the 14th that we were there because it just was not resolved. No one had taken a hard position yet."[8] Drake testified he was not sure there was a disagreement on the effectiveness of the May 6 notice, but he sent the letter due to his concern a disagreement *could occur*. Drake also testified:

> Q. At any point at or around May 14, 2013, did you tell [John and Kelly] that Jim [Gansen] flat out was not going to accept any money because he felt that the May 6 notice was late? A. No. I don't think it was ever a flat out—I think Jim had said he wasn't inclined to do that, but, like I said, [Jim] felt bad, he wanted to try to see if he could work something out with them on a lease, [or they] could buy the house or something back, but there weren't any concrete proposals, but generalities.
> Q. Was there any talk about if [John and Kelly] were able to tender the purchase price at all, whether it would be acceptable? A.

---

[7] Drake also testified:

> Q. Was it practical to obtain some $957,000 plus . . . interest . . . plus the $2500 in the form of a check without having a commitment on the part of Mr. Gansen that he would deed the property in exchange for that? A. That would be very difficult, particularly with a commercial lender. I hoped that the Maquoketa investor might be someone who could do that.

[8] Drake's May 14 letter stated:

> At the time [we prepared the option agreement] we advised if there was ever a disagreement between the parties, we could not represent either party in connection with that disagreement. We acknowledge [JKT Farms by John and Kelly] provided the election to exercise on May 6. We are concerned that a disagreement between you related to the effectiveness of that election could occur. As such, we feel that we cannot represent either of you in connection with that issue or related issues. While we do not know if there IS in fact or will be a disagreement, we simply want to clarify we cannot represent either party in connection with that issue IF a disagreement does arise.

I don't know that I had any of that conversation with Mr. Gansen. I don't recall that.

        Q. Would I be accurate to state [Gansen] never said he would refuse payment if it were tendered by May 18? A. I don't recall that at all, no.

Although Drake had told the parties to get their own counsel, he continued serving as a "conduit of ideas" on May 15, 16, and 17. Drake called Jim Gansen, who was "open to trying to work something out." At one point Kelly told Drake they were considering just "letting it go" and "would get a small acreage somewhere and do some custom farming." Drake testified it was "open season on ideas at that point, everybody throwing different things around."

JKT Farms through John and Kelly never tendered any money to the Gansens before, on, or after May 18, 2013. There was no closing on May 18, and the option expired unexercised. At trial, although John and Kelly testified they had financing available and were willing and able to close, they failed to produce documentation from American Capital or any other lender showing a funding commitment. Also, at no time did John and Kelly contact Drake to arrange a closing on or before May 18. But on the closing date, Kelly directed Drake to call Gansen. At trial, Drake described Kelly's instructions:

> [Kelly said] see if Jim [Gansen] will give a buyback price . . . we were moving away—it was clear at that point the funding wasn't coming through. There wasn't going to be a closing by the 18th. I think [Kelly and John] were moving to let's look for some other resolution, and [Kelly was] asking was there some price at which [Gansen] would sell? Ignoring the price on the option, is there some higher price at which he would sell it back, *if [John and Kelly] were able to get funding.*

(Emphasis added.) We find Kelly's instruction to Drake to obtain a buy-back price from Gansen, along with the fact Kelly never contacted Drake to set up a closing,

inconsistent with John and Kelly's position at trial that they had the financing available and were ready to close on May 18. Upon our review and in light of all the circumstances, we find the testimony of John and Kelly not credible. When Drake talked to Gansen about a buyback price, Gansen replied he "was open to selling the house and some acreage and leasing the balance of the farm or leasing the whole farm, but he did not want to sell it back at that point." Drake communicated this information to Kelly.

When Gansen went to check the fields after May 18 to prepare for his upcoming planting, he was surprised to discover John was already planting. Seeking to avoid conflict, Gansen wrote to John and Kelly, offering the rental price of $200 per acre for the 2013 crop year. John and Kelly did not reply.

Because John had already planted crops and did not respond to the letter, the Gansens were concerned they might not receive any farm income to cover their debt payment. Accordingly, they obtained other counsel. On July 18, 2013, their counsel sent a letter to John and Kelly via certified mail offering to rent at $200 per acre for the 2013 crop year. To prevent an automatic renewal of tenancy for the 2014 crop season, the letter also included a notice of termination of farm tenancy. When John and Kelly failed to claim this letter, the Gansens' counsel had the sheriff serve, on August 13, 2013, a similar letter and notice dated August 9. When John and Kelly still failed to respond, the Gansens caused the sheriff to serve, on September 12, 2013, a notice to quit. After making no effort to resolve the rent issue from May to September, John and Kelly finally made a counteroffer to pay $100 per acre. The Gansens replied with their own

counteroffer but again received no response. Meanwhile, John and Kelly remained in possession.

Trial to resolve title and the possessory rights of the parties in two cases proceeded concurrently in April 2014, without consolidation.[9] The parties agreed "any mortgage debt owed to [Dupaco] is a first priority mortgage as to the title that either [party] may have in this matter" and agreed Dupaco need not appear. The Gansens had paid the property taxes in March 2013, September 2013, and March 2014. John and Kelly had harvested the entire 2013 crop, sold over $100,000 worth of corn, and paid nothing to the Gansens. The record supports the district court's finding: "It is apparent that in any and every meaningful way [John and Kelly] acquiesced to the Gansens' ownership of the property as of [May] 18, 2013, other than [John and Kelly] planted and harvested the 2013 crop." At trial, the Thoma family asked the court to impose an equitable mortgage, and the court declined:

> [The] Thomas argue that the transaction should be viewed as an equitable mortgage. In *Steckelberg v. Randolph*, 404 N.W.2d 144 (Iowa 1987), the Iowa Supreme Court held that an equitable mortgage must be proven by clear, satisfactory, and convincing evidence that the transaction was intended to be a loan and security agreement instead of an absolute conveyance.
> The documents in this case are clear, convincing, and unequivocal. It was the written agreement of Thoma and Gansen

---

[9] In October 2013 the Gansens filed a forcible entry and detainer (FED) action in small claims court. Nine days later John and Kelly, JKT Farms, and Ernest and Alice filed the declaratory judgment action currently on appeal (EQCV 027719). The small claims court dismissed the Gansens' FED action, deferring to the district court. The Gansens then brought the instant FED action in district court (EQCV 027731). The FED defendants sought a stay, requesting their declaratory action be resolved before the Gansens' FED action. They also sought to consolidate the cases. In December 2013 the district court stayed the Gansens' FED action, finding the "parties agreed that the evidence would be submitted on both matters without the necessity of bifurcating the hearing."

that the warranty deed was an absolute conveyance, not mere security. Thomas' rights to the property were preserved *only* in so far as they adhered to the option agreement, which by its own terms must be performed in a timely fashion . . . . [John and Kelly's] failure to perform by May 18, 2013, extinguishes all their right, title, and interest to the property in question.

The court ordered John and Kelly to pay $71,601.24 in rent to the Gansens, ordered immediate possession to the Gansens, and ordered each party to pay their own attorney fees. Thereafter, the court entered an order nunc pro tunc assessing the costs of the Gansens' FED action to John and Kelly. The Thoma family appeals, claiming the district court erred in failing to impose an equitable mortgage.[10] The Gansens cross-appeal, claiming the district court abused its discretion in failing to grant their requests for attorney fees.

## II. Standard of Review

When an action for declaratory judgment is tried in equity, our review is de novo. *See N. Natural Gas Co. v. Forst*, 205 N.W.2d 692, 694 (Iowa 1973). Similarly, we review de novo an action for forcible entry and detainer tried as an equitable action. *See Roshek Realty Co. v. Roshek Bros. Co.*, 87 N.W.2d 8, 10 (Iowa 1957). On de novo review we "give weight to the trial court's findings of fact but are not bound to them." *Freese Leasing, Inc. v. Union Trust & Sav. Bank*, 253 N.W.2d 921, 925 (Iowa 1977).

## III. Equitable Mortgage

We are asked to determine whether the transfer of a warranty deed from Ernest and Alice to the Gansens and a separate option agreement from the

---

[10] The Thoma family claims John and Kelly, under an equitable mortgage, "were entitled to remain in possession, until foreclosure, sale and expiration of the right of redemption, subject to" the Gansens "right to seek a receivership."

Gansens to JKT Farms, LLC, for the benefit of John and Kelly, resulted in an absolute conveyance by deed or an equitable mortgage. John and Kelly claim the parties intended the warranty deed to be a security, not an absolute conveyance, and the court should have imposed an equitable mortgage. The Gansens claim the district court correctly ruled the warranty deed was an absolute conveyance of title.

"It is well settled a transfer of title absolute on its face, if intended as security alone, will be deemed a mortgage. And such intent may be shown by parol" evidence. *Lovlie v. Plumb*, 250 N.W.2d 56, 59 (Iowa 1977); *see Trucks v. Lindsey*, 18 Iowa 504, 504 (1865) ("A conveyance absolute on its face may, by proper evidence, be shown to be but a mortgage."). In determining the intent of the parties, this court ascertains the actual relationship of the parties by looking behind the "form of an instrument." *See Steckelberg*, 404 N.W.2d at 149. The grantors-Ernest and Alice have "the burden to show by clear and convincing evidence that the deed was intended to be something other than what it purports to be." *See Koch v Wasson*, 161 N.W.2d 173, 178 (Iowa 1968); *see also Reusch v. Shafer*, 41 N.W.2d 651, 657-58 (1950) (stating upon "clear, satisfactory, and convincing evidence," an instrument labeled a "deed" may be construed as an "equitable mortgage")). "If it is unclear whether" an "absolute deed was intended, we resolve the doubt in favor of an equitable mortgage." *Steckelberg*, 404 N.W.2d at 149. "[E]ach case must be considered on the totality of its own facts." *Koch*, 161 N.W.2d at 178.

"A telltale sign" that a deed "amounts only to an equitable mortgage" is "where the transaction of which [the deed] is a part operates to create or continue as between the parties the relation of obligor and obligee." *Steckelberg*, 404 N.W.2d at 149; *see Koch*, 161 N.W.2d at 175-78 (holding where (1) the plaintiffs "needed money to pay others and both parties treated the transaction as giving rise to a debtor-creditor relationship" and (2) the plaintiffs conveyed legal title by deed to the defendants and in the same transaction the plaintiffs received back an option contract allowing the plaintiffs to *repurchase* the property, the deed "with reciprocal option to purchase was" an equitable mortgage).

An early example of these principles is *Fort v. Colby*, where, as here, the grantor was under pressure from creditors other than the grantee. 144 N.W. 393, 401 (Iowa 1935). The *Fort* grantor did not know the grantee, who approached the grantor and "solicited the opportunity to make the loan" to the grantor. *Id.* at 394. The grantee's attorney drafted both the contract and the warranty deed by which the grantor deeded the land to the grantee. *Id.* "On the same day, and apparently as part of the same transaction, [the grantee] executed and delivered to [the grantor] a lease . . . for five years, with an exclusive option to [the grantor] to purchase the same." *Id.* The grantor remained on the land and eventually sued in equity to declare the conveyances a mortgage. *Id.* In resolving the "the actual nature of the transaction which culminated in the conveyances," the court recognized where a deed "is accompanied by a contract or agreement, by which the grantee undertakes to *reconvey* the land to the grantor" and the circumstances "render[] it doubtful whether a mortgage or conditional sale was

intended, the courts will hold it to be a mortgage." *Id*. at 395-96 (emphasis added). The *Fort* court ruled the transaction was "one of loan and security" and not a "sale." *Id.* at 404.

A later example of circumstances causing a court to impose an equitable mortgage is *Steckelberg*, the case the Thoma family claims the district court "misapplied." 404 N.W.2d at 148-49. To prove an equitable mortgage, the grantors-Steckelbergs had to show: "(1) the consideration for the warranty deed was an existing indebtedness, together with the amount of such indebtedness; and (2) such indebtedness was not extinguished by the conveyance, but was kept alive." 404 N.W.2d at 148. The antecedent-debt requirement "may also be satisfied by an assumption of liability or a contract for future advances contemporaneously made." *Id.* at 149. Finding the transaction "archetypical of an equitable mortgage," the court stated the grantors-Steckelbergs' retention "of possession of the transferred property" is a "circumstance inconsistent with the theory of absolute conveyance. And the execution and delivery of an option to repurchase, the unavailability of legal advice for the grantor, and financial hardship as an inducement to the grantor in entering the agreement, all constitute classic circumstances pointing to a debtor-creditor relationship." *Id.* (citations and quotation marks omitted). The district court reached the "inescapable" conclusion that an equitable mortgage existed:

> The Steckelbergs were in desperate financial straits when they became obligated to Randolph. As a result they conveyed their farm to him, executing a contract which provided for reconveyance of the farm when the obligation was repaid. At all material times the Steckelbergs remained on the farm.

> . . . In consideration of their conveyance of their farm, Randolph offered no more than to help them in settling and compromising outstanding debts. Any money he invested was to be repaid. The Steckelbergs entered the transaction at Randolph's urging and suggestion, without the assistance of independent legal advice or counsel. Although there was no antecedent debt between the parties prior to the transaction, it is clear the agreement itself contemplated future advances by Randolph, which created a debtor-creditor relationship [between the Steckelbergs and Randolph].

*Id.*

Here, Alice and Ernest conveyed a warranty deed to the Gansens in circumstances completely unlike the circumstances leading the *Steckelberg* and *Fort* courts to impose an equitable mortgage*.* While the record shows an antecedent debt between Ernest and Alice and FCSA, there is no agreement contemplating future advances by the Gansens to Ernest and Alice in a debtor-creditor relationship. *See Steckelberg*, 404 N.W.2d at 149. Alice testified, "We didn't owe [the Gansens] anything and they didn't owe us [Ernest and Alice] anything" after the 2013 closing. This statement is reinforced by the testimony of the parties' "conduit of ideas," attorney Drake:

> I had . . . a call in to Mr. Gansen to find out what it looked like, was there some possibility. And at some point in there, I believe, that it was going to have to be structured as a purchase transaction . . . . I don't know that we ever discussed any other option.

The parties did not intend the warranty deed to create a security for some future obligation—Ernest and Alice's antecedent debt to FCSA was extinguished after Dupaco transferred the funds. Further, Ernest and Alice had no antecedent debt with the Gansens, and as Alice testified, there was no future obligation for advances between grantors-Ernest and Alice and grantees-the Gansens. These

circumstances lead us to reject the Thoma family's "deed as security" claim because no obligation existed that needed to be secured. *See id.*; *Fort*, 144 N.W. at 401-02.

Recognizing the instant circumstances are distinguishable from the case law, the Thoma family tries to shoehorn this transaction into the equitable-mortgage factors by claiming, although Ernest and Alice were the legal owners of the farms, John and Kelly were the equitable owners under their November 2012 contract with Ernest and Alice. *See Pierce v. Farm Bureau Mut. Ins. Co.*, 548 N.W.2d 551, 555-57 (Iowa 1996) (discussing executory real estate contracts). Based on the totality of the circumstances, we are not persuaded. It is undisputed John and Kelly never obtained the financing to close on the 2012 sales contract, even after an extension of the closing date. During oral argument counsel for the Thoma family stated the 2012 contract was not recorded by the Thoma family and thus was not included in the abstract. Second, any equitable interest John and Kelly had in the farms was extinguished by the superseding 2013 "offer to buy and acceptance" sales contract between Ernest and Alice and the Gansens for the same farms, as shown by the six signatures on the 2013 contract—Ernest and Alice, John and Kelly, and Jim and Mary Gansen—and by the Thoma family's admission at trial that Dupaco was the creditor in first position. *See id.*

Third, at oral argument counsel for the Thoma family admitted any equitable interest of John and Kelly from the 2012 contract could be defeated by the actions of Ernest and Alice. *See id.* at 556 (recognizing "when a vendee [John and Kelly] is in default under an executory real estate contract" the vendee's

equitable interest can be defeated by the vendors [Ernest and Alice] who have the "right to rescind the contract in toto"). Paragraph 22 in the 2013 sales contract, a paragraph added at the insistence of Ernest and Alice's independent legal counsel, demonstrates that Ernest and Alice's 2013 sales contract with the Gansens superseded and rescinded Ernest and Alice's 2012 sales contract with John and Kelly. *See id.* Paragraph 22 *separately required* John and Kelly to pay Ernest and Alice the difference between the Gansens' FCSA debt payoff and $1 million upon John and Kelly's exercise of their separate and independent option agreement with the Gansens, an option agreement that did not involve Ernest and Alice. Thus, under paragraph 22, John and Kelly and Ernest and Alice reached a new, separate side agreement obligating John and Kelly to pay Ernest and Alice an amount that would result in Ernest and Alice obtaining the identical $1 million sale price from John and Kelly as found in the superseded 2012 sales contract. Paragraph 22 was only necessary because Ernest and Alice and John and Kelly understood and intended for the 2013 sales contract (selling the farms to the Gansens for the FCSA debt amount) to supersede and rescind the 2012 sales contract (selling the farms to John and Kelly for $1 million minus FCSA debt amount). Accordingly, Ernest and Alice's actions in 2013 rescinded and voided any equitable interest of John and Kelly that arose from the 2012 sales contract. *See id.*

Other factors leading to a court's imposition of an equitable mortgage are similarly missing. For example, the grantors did not retain possession of the property; rather, Ernest and Alice did not have possession either before or after

the transaction. *See Koch*, 161 N.W.2d at 178. Also, grantees-Gansens did not execute a *repurchase option* in favor of grantors-Ernest and Alice, i.e., the Gansens made no promise to *reconvey* the farms to Ernest and Alice. *See Steckelberg*, 404 N.W.2d at 149; *Fort*, 144 N.W. at 402 ("[A]mong the most frequent devices employed to conceal the real character of a deed given as a mortgage is the plan by which . . . the grantee [the Gansens] gives [the grantor, Ernest and Alice,] a contract to reconvey the land on certain specified conditions."). We again turn to the testimony of Alice, who explained she and Ernest understood they, personally, did not have any right to buy the farm back from the Gansens.

Another factor leading us to conclude the parties intended an absolute conveyance and sale is grantors-Ernest and Alice had the benefit of independent legal counsel from Runde. *See Steckelberg*, 404 N.W.2d at 149. Alice testified she had not spoken to either Jim Gansen or attorney Drake—"never met the man." Also, Runde drafted the warranty deed. The final circumstance differing from *Steckelberg*, where the grantees initiated the transactions, is that Kelly asked her attorney, Drake, to approach the Gansens as time was running out to stop the sheriff's sale. The Gansens in no way sought out the Thoma family or initiated these transactions. *See id.* Instead, after being contacted by Drake, the Gansens and their lender made it clear that a condition precedent for them to act in such an extraordinarily short time frame, so extraordinary that two other banks would not act, was for the resultant transaction to be a purchase by the Gansens with Dupaco in first position as creditor. Drake testified he conveyed the condition

precedent to Kelly, she agreed, and she instructed Drake to draft the necessary documents and bring the title up to date. *See Davis v. Wilson*, 21 N.W.2d 553, 557 (1946) ("The conduct of the parties leading up to the making of a deed . . . is frequently of great weight in determining whether the intent was to buy and sell or merely give security in a new form."). The conduct of the parties here evinces a clear intent "to buy and sell" as memorialized by the warranty deed to the Gansens.[11]

We conclude the doctrine of equitable mortgage is inapplicable. The Gansens became the legal owners of the farms pursuant to the warranty deed, and the ownership interest of Ernest and Alice terminated with the granting of the deed. Any equitable ownership interest JKT Farms might have had in the Gansens' farm ended when JKT Farms failed to give written notice of its intent to

---

[11] The overall transaction structure and paragraph 22 rebut the Thoma family's claim a security was intended due to the Gansens paying inadequate consideration for the farms. *See Fort*, 144 N.W. at 403 (stating the "mere inadequacy of consideration is not sufficient to justify the conclusion that a deed absolute in form is intended as a mortgage" because "such inadequacy" is rather "a very material fact to be considered with other circumstances tending to support that conclusion"). Ernest and Alice still hoped to receive $1 million for the farms and, against the advice of their attorney, independently decided to forgo any excess proceeds from a sheriff's sale to give John and Kelly an opportunity to buy the farms under the option. Thus, the amount the Gansens paid was not a price somehow inequitably demanded by the Gansens. Drake testified:

> [Runde] didn't like the transaction for his clients [Ernest and Alice,] obviously. And at one point [Runde] said, "Why should my clients do this"? And I said, "They shouldn't, because they are the ones taking the risk. But the only reason they might is because they feel this is the only way John and Kelly may get the farm . . . ." We were all operating on the assumption that if it went to the sale it was going to bring . . . maybe several hundred thousand dollars more [than $1 million] . . . . [W]e were operating on the assumption [John and Kelly] would have no opportunity to get the farm at all, and [John and Kelly] just needed some time to work through this with American Capital or some other lender. And I told [Runde] that's the only reason [Ernest and Alice] would [do this]. They are taking a risk [by foregoing receipt of the excess sale proceeds] in the hope that John and Kelly will get the funds and be able to buy the farm [under the option].

exercise its option on or before May 1, 2013, followed by its failure to arrange a closing and tender the purchase price on or before May 18, 2013.[12]

## IV. The Gansens' Cross-Appeal—Attorney Fees from Ernest and Alice

The Gansens' answer in the declaratory judgment action asserted a counterclaim against Ernest and Alice for breach of the covenant of title in the warranty deed, which provided: "Grantors [Ernest and Alice] Covenant to Warrant and Defend the real estate against the lawful claims of all persons." Under this covenant, the Gansens sought attorney fees from Ernest and Alice, fees the district court declined to award. On appeal the Gansens claim: "In a case where the grantors bring a claim against the grantees attacking their own warranty deed, attorney fees are clearly warranted." They also seek appellate attorney fees.

In support, the Gansens cite *Kendall v. Lowther*, where the court stated similar provisions constitute "an agreement by the grantor that upon the failure of the title which the deed purports to convey . . . the grantor will pay compensation for the resulting loss." 356 N.W.2d 181, 189-90 (Iowa 1984). In *Kendall*, the court found attorney fees recoverable due to "exceptional facts," and also set out the general rule: "It is true that ordinarily a grantee cannot recover for breach of a covenant of warranty if the grantee has successfully defended the title." *Id.* at 190. Here, the Gansens successfully defended the title. We conclude this case does not present "exceptional facts," and under the applicable general rule, the Gansens are not entitled to either trial or appellate attorney fees from Ernest and

---

[12] We conclude the district court correctly put the Gansens in immediate possession of the real estate and uphold the order requiring John and Kelly to pay the 2013 rent to the Gansens.

Alice. *See id.*; *see also Eggers v. Mitchen*, 38 N.W.2d 591, 592 (1949) ("Thus a covenant of warranty is not violated by the existence of an outstanding, but unfounded, claim upon the property.").

**V. The Gansens' Cross-Appeal—Attorney Fees from John and Kelly**

The Gansens' counterclaim also asserted JKT Farms, LLC breached the terms of the option agreement by bringing suit against the Gansens. The Gansens sought to recover the attorney fees incurred in defending the equitable mortgage claims and prosecuting their FED action under paragraph 12 of the option agreement, providing: "In the event either party breaches any term of this agreement, the non-breaching party shall be entitled to all right and remedies at law or equity and shall be entitled to the recovery of attorney fees or costs incurred due to such breach." The Gansens request a remand for the district court to assess and award trial and appellate attorney fees.

Generally, attorney fees are not allowable "unless authorized by statute or contract." *W.P. Barber Lumber Co. v. Celania*, 674 N.W.2d 62, 66 (Iowa 2003). "[A]n express provision in a contract between parties authorizing the payment of attorney fees and litigation expenses is an authorization to a court in an action based on that contract to add attorney fees and litigation expenses *to a favorable judgment*." *EFCO Corp. v. Norman Highway Constructors, Inc.*, 606 N.W.2d 297, 301 (Iowa 2000) (emphasis added). Here the district court did not enter judgment on the Gansens' counterclaim for breach of contract. Accordingly, we affirm the district court.

**AFFIRMED.**